**JOHNSON & JOHNSON and "A" Company, Incorporated, Plaintiffs–Appellants,**

v.

**GAC INTERNATIONAL, INCORPORATED, Defendant–Appellee.**

Docket No. 88–7307, No. 27, Aug. Term 1988.

United States Court of Appeals, Second Circuit.

Argued Oct. 3, 1988.

Decided Dec. 6, 1988.

Thomas C. Morrison, New York City (Patterson, Belknap, Weber & Tyler), for plaintiffs-appellants.

Albert J. Breneisen, New York City (Kenyon & Kenyon), for defendant-appellee.

Before FEINBERG, Chief Judge, and NEWMAN and GARTH,* Circuit Judges.

GARTH, Circuit Judge:

Plaintiffs/Appellants, Johnson & Johnson and its subsidiary "A" Company ("'A' Company"), appeal from a judgment, following a bench trial, entered in favor of Defendant/Appellee, GAC International, Inc. ("GAC"). "A" Company brought an action against GAC under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), alleging that GAC had falsely described its product and had misrepresented goods in interstate commerce. In specific, "A" Company alleged that GAC had improperly termed its orthodontic bracket "polysapphire". The district court rejected this claim. We reverse.

## I.

This case involves the nature and marketing of a particular material used in the fabrication of orthodontic brackets. An orthodontic bracket is a small post which is bonded to the surface of a patient's tooth. A wire is then attached to the orthodontic bracket, and the tooth is moved by placing tension on the wire.

In May 1987, "A" Company introduced a bracket made of a single crystal of aluminum oxide. The bracket was formed by melting pieces of solid aluminum oxide, suspending a crystal of aluminum oxide in a rod-shaped die, and then drawing the liquid aluminum oxide up the die, always maintaining contact with the suspended crystal. As the liquid cools, the molecules of aluminum oxide align themselves with the suspended crystal, resulting in a rod-shaped, single crystal of aluminum oxide. This crystal is then cut and machined to form the orthodontic brackets. A single crystal of aluminum oxide (monocrystalline aluminum oxide) is more commonly referred to as a sapphire, and accordingly "A" Company refers to its product as a "sapphire" bracket. An advantage of this "A" Company innovation is that it is transparent, and thus cannot be seen against the white of a tooth.

GAC first marketed a bracket made out of aluminum oxide in 1984. This bracket and all of GAC's subsequent aluminum oxide brackets, including its most recent product the Allure III, are not made out of a single crystal. Instead, they are formed by heating hundreds of thousands of tiny grains of aluminum oxide along with a binder. The combination of the heat and the binder causes the particles to stick together. The result is a translucent, polycrystalline substance, out of which the bracket is formed. When GAC first introduced its aluminum oxide bracket, the bracket was marketed as a ceramic product. Though it is made in substantially the same manner as the earlier versions, GAC now markets its most recently introduced bracket, the Allure III, as a "polysapphire" bracket and not a ceramic bracket.

Because it is not made out of a single crystal, "A" Company claims that the GAC material is technically not a sapphire. Nevertheless, GAC markets its bracket as a "polysapphire" product. "A" Company claims that because the product is not a sapphire, calling it "polysapphire" is false and misleading and violates the Lanham Act.

---

* Honorable Leonard I. Garth, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

GAC introduced its Allure III, "polysapphire" bracket, in August, 1987. "A" Company filed the instant lawsuit in December, 1987. "A" Company's complaint sought injunctive relief preventing GAC from using the term "polysapphire". During the week of March 14, 1988, the district court consolidated the preliminary injunction hearing with a trial on the merits. On March 23, the district court made findings in an oral opinion and denied "A" Company's claims for relief. A judgment was entered in favor of GAC on March 24, and "A" Company now appeals.

## II.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) imposes liability for the use of a "false description of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same...."

This court has established two different theories of recovery in Lanham Act false advertising actions: (1) an advertisement may be false on its face; or (2) the advertisement may be literally true, but given the merchandising context, it nevertheless is likely to mislead and confuse consumers. In *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312 (2d Cir.1982), we described these alternative bases for recovery as follows:

> When a merchandising statement or representation is literally or explicitly false, the court may grant relief without reference to the advertisement's impact on the buying public. *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir.1978); *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356 (S.D.N.Y. 1976). When the challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction. *American Home Products*, 577 F.2d at 165.

*Id.* at 317.

"A" Company argues that by GAC's advertising and styling its product as "poly-

sapphire", GAC has made a facially false claim as GAC's bracket is not actually made from a sapphire. "A" Company also asserts that even if the term "polysapphire" is not false on its face, the term nevertheless is likely to confuse prospective purchasers.

### A.

The district court rejected both of "A" Company's arguments. The district court stated that "in its common lay usage, the term 'sapphire' refers to a natural gem quality, monocrystalline form of alpha aluminum oxide, generally blue in color". (A. 19). Since GAC concedes that its product is not monocrystalline, it is clearly not a sapphire. The district court concluded that "it would be unlawful for defendant to refer to its product as being made of sapphire...." (A. 21). However, the district court observed that GAC employed the term "polysapphire" not just plain "sapphire." [1]

The district court viewed the term as a "coined term" (A. 23), and one that was not likely to confuse. The district court found persuasive the fact that "A" Company's own expert witness testified that when he heard the term "polysapphire" he immediately recognized that it was a polycrystalline aluminum oxide. (A. 21, 341–342, 376–377). Moreover, the district court found that if both the "A" Company and GAC products were ground up, the results would be identical because each of the individual grains in the GAC product is made of aluminum oxide, which is the substance that constitutes a sapphire. (A. 21).

The district court also examined the evidence designed to show a likelihood to mislead or deceive. The parties organized the evidence proving confusion or deception into several categories: (1) intent to mislead; (2) commercial context; (3) actual confusion; and (4) survey evidence.

On the first issue of intent to mislead, the district court acknowledged that GAC,

---

**1.** The district court pointed out that the term     sapphire was generic and not a trademark.

in an internal memorandum sent to all GAC salesman stated:

"[W]e should only refer to ALLURE III & POLYSAPPHIRE BRACKETS EX- CLUSIVELY FROM THIS DATE. *No more* ceramics, *we're a sapphire too* or anything else. The "polysapphire" is ac- tually an advancement over the SAP- PHIRE and we don't want to be associat- ed with an antiquated product."

(E. 248) (emphasis added).

The district court considered the commer- cial context in which the product was sold. The district court found that the consumers are orthodontists, whom the court found to be sophisticated purchasers, and that most sales are made through direct personal pre- sentations, where the purchaser could see the differences between the product and could ask the salesman what "polysap- phire" meant. Although neither party in this case ever directly advertised to the general public, the introduction of "A" Company's sapphire bracket generated sub- stantial publicity and patient demand.

The district court also noted that there was some evidence of actual confusion. The most persuasive evidence of actual confusion was a letter to GAC from an orthodontist who actually thought that the polysapphire bracket was the same as the sapphire bracket. However, in reviewing the evidence of actual confusion, the dis- trict court found the evidence to be "unper- suasive, isolated, and, as noted likely to be ephemeral." (A. 23). The district court believed that any confusion would be dissi- pated by greater exposure, as the products of each company are visually distinguish- able. (A. 22).

At the trial, "A" Company introduced evidence of a survey it had taken. The survey sought responses to, among others, the following two questions which were based on a GAC brochure:

4. Again based on the brochure, from what material or material do you feel Allure III Appliances are made?

5. The brochure describes Allure III as being a polysapphire appliance. Do you think that polysapphire is a type or form of sapphire or do you think that polysapphire is a different mate- rial than sapphire?

(E. 223, 224).

Approximately 29% of the orthodontists responding to survey question 4 thought that "polysapphire" was sapphire or syn- thetic sapphire, and 45% responded to ques- tion 5 that "polysapphire" was a type or form of sapphire.

The district court found the evidence of confusion, especially the survey, to be un- persuasive. It criticized the survey as one that was structured to produce a desired result. The district court noted that the survey did not ask what it, the district court, believed to be the obvious and cru- cial question: do you think there is a differ- ence between "polysapphire" and "sap- phire?" The district court stated its belief that had this question been posed, the over- whelming response would have been yes. (A. 24). The district court supported this conclusion by underscoring that sapphire was a very positive term, and that it would be irrational to dilute the image of rarity and purity conjured up by the term sap- phire with the modifier "poly," unless the term described something that was not a sapphire. *Id.*

The district court concluded as follows:

We conclude that defendant's use of "polysapphire" in this context is not a false and deceptive description of its product, and hence does not violate the Lanham Act. We find that it does not tend to mislead and that there is no dan- ger to the consuming public.[2]

(A. 24).

## B.

■ Before reviewing the district court's judgment, we turn to a consideration of our standard of review. As noted previously, there are two alternative theories for re-

---

**2.** The district court's opinion discussed in some detail the issue of likelihood of confusion. We have recited its analysis and its conclusion in text above so as to provide a complete descrip- tion of the district court's treatment of the is- sues in this case. Because we dispose of this case on facial falsity grounds, we need not reach the issue of consumer confusion.

covery under the Lanham Act false advertising cases: (1) advertising, which is facially false; or (2) advertising which is literally true—but, given the particular context—likely to mislead. The parties disagree on the appropriate standard of review with respect to a claim that the term "polysapphire", when applied to GAC's product, is false on its face.

In *Coca–Cola*, this court held that a trial court's finding of facial falsity *vel non* was an issue of fact. 690 F.2d at 317–18 ("in viewing defendant's 30–second commercial at oral argument, we conclude that the trial court's finding that this was not facially false is an error of fact."). However, because the finding in that case was based upon documentary evidence, and did not rest upon credibility determinations, in *Coca–Cola* we undertook a plenary review. Since the *Coca–Cola* case, Federal Rule of Civil Procedure 52(a) has been amended to require that all "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...."

Given this change in the governing standard, and this court's established precedent that facial falsity is an issue of fact, logic dictates that we now apply the clearly erroneous standard when reviewing district court findings regarding facial falsity. Moreover, this decision is consistent with recent assumptions of this court. In *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381 (2nd Cir.1986), an appeal argued shortly after the effective date of the amendment to Rule 52(a), Judge Friendly, writing for the court stated:

> Although argument could be made to the contrary, *see, e.g., Antilles Steamship Co. v. Members of American Hull Insurance Syndicate*, 733 F.2d 195, 203–07 (2nd Cir.1984) (Newman, J., concurring) (question how a reasonable person would understand a writing is one of "textual interpretation" and should be treated as a matter of law), we will assume arguendo, *see Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317–18 (2d. Cir.1982), that the district judge's determination of the meaning of the advertisement was a finding of fact that "shall not be set aside unless clearly erroneous." F.R.Civ.P. 52(a). This means, in the classic language of *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), that we may not reverse the judge's findings ... unless on the entire evidence we are "left with the definite and firm conviction that a mistake has been committed." See *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

*Avis,* 782 F.2d at 384.

We will therefore review the district court's finding of facial falsity under the clearly erroneous standard.

## III.

■ It is undisputed, and the district court so found, that it would be improper for GAC to term its polycrystalline product "sapphire." Both "A" Company and GAC agree that a sapphire is monocrystalline. However, GAC argues, and the district court found, that by adding the prefix "poly", the root "sapphire" is sufficiently modified so as not to offend the standards of § 43 of the Lanham Act. We cannot agree.

GAC contends that "polysapphire": (1) is short for "polycrystalline sapphire," a term that could only be understood as meaning aluminum oxide, the chemical component of sapphire, in a polycrystalline form; (2) connotes a substance that is different from sapphire; or (3) truthfully connotes a substance made of many sapphires.

Contrary to the District Court, we cannot accept any of these contentions. As noted above, Judge Sand found persuasive the testimony that "A" Company's own expert gemologist, Dr. Nassau, understood the term "polysapphire" to mean a polycrystalline substance. Judge Sand then asserted that orthodontists who purchase orthodontic brackets "may be assumed to have received scientific education and training," and he thus concluded that like Dr. Nassau, such orthodontists also would not be misled by the word.

Although Dr. Nassau deciphered "polysapphire" as meaning a polycrystalline form of aluminum oxide, we find no reason to believe that an orthodontist, or indeed anyone except a gemologist or mineralogist, would draw such a conclusion. While the simple fact that orthodontists have received scientific training is certainly true, there is no evidence or basis in this record for a finding that the particular training given orthodontists would assist them in distinguishing between the terms "sapphire" and "polysapphire," or in reaching the conclusion that "polysapphire" meant *not* a sapphire, which is monocrystalline, but rather a polycrystalline substance. The record does not disclose, and we are unwilling to assume, that the training an orthodontist receives includes training in gemology or related sciences.

The district court also predicated its conclusion on the fact that the "sapphire" product and the "polysapphire" product are visually distinguishable because one is transparent and the other translucent. We do not understand how the appearance of the two products has any bearing on the accuracy of GAC's label. The simple fact that a glass bowl does not look like a porcelain bowl has no bearing on whether the porcelain can properly be called glass, or even "polyglass".

■ Indeed, in order for an orthodontist to distinguish visually between the two brackets at issue here, it is likely that he or she would have to order both. We believe the Act's requirement of truthful marketing would be defeated if we were to allow the dubious veracity of a manufacturer's claim to be cured by the fact that the consumer may not make the same mistake twice. The fact that the consumer may have been led to buy the product once, in reliance upon the misleading claim, is sufficient to invoke the protections of the Act.

GAC's second contention, that "polysapphire" connotes a substance that is not a sapphire, simply defies logic and common sense. There are many ways of suggesting that a substance is not a sapphire, but the word "polysapphire" is not one of them. It is true, as Judge Sand stated,

that "polysapphire" is a "coined word" in the sense that the word did not exist before GAC made it up. But it is not the type of arbitrary or fanciful coined word that has no preexisting meaning or connotation. The prefix "poly" means many, and "sapphire," in this context, means the gem sapphire. Putting these two words together would suggest to most people, including, we think, orthodontists, either a substance made of many sapphires, or some variety or form of sapphire. We find that any of these possible meanings are facially false.

GAC's third contention is that "polysapphire" means "many sapphires," a truthful description as applied to its product. GAC relies on the testimony of its president for this contention:

Q. Your basis for saying that this name is okay is that in your product there are individual sapphires, individual particles which if looked at separately could be deemed to be sapphires?

A. They could be, yes.

Q. And, therefore, because the word is "polysapphire", poly meaning many, you said on your deposition, right?

A. Yes.

Q. So what your product is many sapphires, correct?

A. Yes.

Q. And that is why you think your product communicates a truthful message?

A. I think it is an accurate statement.

Q. If, in fact, Allure III were not composed of many sapphires, then you would have no basis for saying that message was truthful, right?

A. It would be inaccurate.

Q. It would be inaccurate?

A. Yes.

(A. 474).

GAC also relies upon the testimony of its expert witness, Dr. Heuer, who testified, upon cross examination, that it might be correct to term the individual grains which make up the GAC bracket, sapphires:

Q. Let's talk about it as a trade name. Let's assume that someone wants to have a trade name for polycrystalline aluminum oxide. Are you comfortable

with "polysapphire" being a correct, true and accurate, scientifically true and accurate trade name for that?

A. I wasn't aware that there was all of those legal underpinnings for trade names.

Q. So that if you accept that a trade name must be correct and accurately describe the product to which it is attached, you would have some discomfort?

A. No.

Q. You would not have discomfort?

A. No. I think sapphire means to me only aluminum oxide single crystals. The word poly is in that sense accurate enough, I think, to satisfy your legal definition.

Q. You get to that conclusion, do you not, by saying that each of these individual grains within the Allure III product individually equated to sapphires; therefore, you have a collection of many sapphires. Is that correct?

A. Yes.

Q. In other words, you would agree that poly translates into many and the word "polysapphire" literally translated would be many sapphires?

A. Yes.

(A. 575).

However, Dr. Heuer's testimony is not consistent on this question. Upon direct examination, he testified that the particles which make up the GAC bracket are usually referred to as aluminum powder, not sapphires.

Q. If I take that very same single crystal of aluminum oxide which is referred to as a sapphire and if I make it into a one micron piece of aluminum oxide, is that still the same material?

A. Yes.

Q. If I call it a sapphire in the one karat size, would it also be called a sapphire in the micron size?

A. You say it could be. Usually when it is in powder form it would be referred to as aluminum powder or some other title.

(A. 563). Later, again on cross-examination, Dr. Heuer conceded that it would not be conventional to refer to the grains of aluminum oxide which make up the GAC bracket, as sapphire.

Q. What would you properly call these ... individual grains or crystals? What are they properly called as a matter of science, the ones you found when you magnified [the GAC bracket] 250 times?

A. Crystals of alpha alumina.

Q. Crystal of alpha aluminum? They're not individual sapphire, are they?

A. It is not conventional, I have to repeat, it is not conventional to refer to them that way.

(A. 577). The testimony of Dr. Heuer, GAC's expert, i.e., that calling the individual grains of aluminum oxide would not be "conventional," was substantiated by the testimony of "A" Company's expert, Dr. Nassau. When testifying generally about products made with the materials and process employed to create the Allure III, Dr. Nassau testified:

Q. Would you consider the individual particles ... to be individual particles of sapphire?

A. No, I would not. I would consider them individual particles of corundum, the reason being, of course, that they are not of gem grade, which is part of the definition of sapphire. They have the same crystal structure, they can be considered crystals but they're obviously much too small to have the beauty or the ability to facet or otherwise be used in the gem field.

(A. 337).

Later, while discussing GAC's Allure III bracket, Dr. Nassau reiterated his opinion that the individual particles contained in the GAC product, could not be considered sapphires.

Q. Let's talk for a minute about the individual grains in the GAC Allure product. Is it your testimony that each of those grains would be a grain of corundum?

A. Yes.

Q. And it would also be a grain of aluminum oxide?

A. Yes.

Q. Could you call each of those grains sapphire?

A. No. I do not think they should be called sapphire because they do not have the attributes of gem quality.

(A. 337–38).

The record, rather than proving that GAC's Allure III is made of many sapphires, demonstrates just the contrary. The testimony which we have quoted above, leaves us "with the definite and firm conviction that a mistake has been committed" by the district court in finding otherwise. *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The term "polysapphire" is, as even the district court recognized, an oxymoron, a self-contradictory term. GAC's argument that each grain of aluminum oxide is a sapphire is neither persuasive, nor more importantly, supported by the record. Indeed, GAC's own expert witness could not accept that proposition without substantial qualification.

■ The fact that "polysapphire" is a "coined" term does not call for a different result. The district court believed that a higher degree of deceptiveness is required under the Lanham Act to bar the use of a new or "coined" term. We do not agree. We are aware of no authority to support that view, and we see no persuasive reason why we should not apply the same standard of deceptiveness to "coined" terms as we do to terms already in use.

■ If a "coined" word (in its entirety or in any of its components) has no preexisting meaning and is thus, in traditional trademark terminology, "fanciful," *see Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 & n. 12 (2d Cir.1976), it of course cannot be false. A word that has no meaning except that which is assigned to it cannot be untrue. But where, as here, a "coined" word incorporates words that do have preexisting meanings and connotations, we see no reason to allow any greater leeway for deceptiveness.

We therefore conclude that the district court was clearly erroneous when it found that the term "polysapphire", as used to describe the Allure III orthodontic bracket, was not false on its face.

IV.

Because we hold that the district court was clearly erroneous in finding that GAC's description of its Allure III bracket as "polysapphire" was not false on its face, we will reverse the March 24, 1988 order of the district court and remand to the district court with instructions to enter an appropriate injunctive order in favor of Johnson & Johnson and "A" Company enjoining the use by GAC of the term "polysapphire" in connection with its orthodontic bracket.