**JR TOBACCO OF AMERICA, INC.,**
**Plaintiff/Counterclaim**
**Defendant,**

v.

**DAVIDOFF OF GENEVA (CT), INC.**
**and AVO Uvezian Cigars, Ltd.,**
**Defendants**

**DAVIDOFF & CIE, S.A. and Oettinger**
**Imex AG, Additional Counterclaim**
**Plaintiffs,**

v.

**CIGARS BY SANTA CLARA, N.A., INC.,**
**JNR Grocery Corporation, 11 East 46th**
**St. Corp., JR Tobacco (New Jersey) Inc.,**
**JR Tobacco Outlet N.C., Inc., United Ci-**
**gar Inc., and JR Tobacco Outlet States-**
**ville, Inc., Additional Counterclaim De-**
**fendants**

95 Civ. 0319(LAP).

United States District Court,
S.D. New York.

Feb. 13, 1997.

Barry G. Magidoff, Sutton, Basseches, Magidoff & Amaral, New York City, for JR Tobacco of America, Inc.

Richard Lehv, Weiss Dawid Fross Zelnick & Lehrman, P.C., New York City, for Davidoff of Geneva (CT), Inc.

## OPINION AND ORDER

PRESKA, District Judge:

This Lanham Act claim arises out of plaintiff's advertisements for premium cigars. Plaintiff and counterclaim defendant JR TOBACCO of AMERICA, Inc. ("JR") initially sought a declaratory judgment that JR Tobacco's advertisements for JR Alternatives, its line of premium cigars, are neither false advertisements nor likely to confuse consumers with respect to the source of the products. Defendants Davidoff of Geneva (CT), Inc. ("Davidoff Connecticut") and AVO Uvezian Cigars, Ltd. ("AVO") have moved, along with additional counterclaim plaintiffs, related companies Davidoff & Cie, S.A. ("Davidoff Switzerland") and Oettinger Imex AG ("Imex"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and under § 43(a) of the Lanham Act, claiming that JR Tobacco's advertisements are literally false.

## I. Introduction

Cigar smoking is currently enjoying an unprecedented renaissance in America. The popularity of cigars has surged dramatically over the past five years. According to the Cigar Association of America, sales of premium cigars rose 29 percent between 1991 and 1994. *Power Puffing Cigarettes may Be Out But Interest in Gourmet Cigars has Been Rekindled,* Jim Reilly, Syracuse Herald–Journal, (Aug. 8, 1995); *see also Cigar Sales Catch Fire; Women Among Buyers,* Glenn Collins, Tulsa World (Feb. 5, 1995). During the first five months of 1996, sales of premium cigars were up 51 percent over the previous year. *Cigar Craze Sparks Stogie 'Smuggling' from Cuba,* John Pacenti, AP, San–Antonio Express–News (Nov. 17, 1996). What is more astounding is that these increases come after almost "30 years of consistent decline." *Cigars All Around,* Robert Nelson, The Omaha–World–Herald (Feb. 27, 1996).

Various commentators have attributed this resurgence in popularity to different causes. Some have described it as a type of neoprohibitionist rebellion, "a bold puff of smoke ... in the face of salads and no-fat dressing and marathon runnerlooking people harping about the stink and death of cigarette smoking." *Id.* The President of the Cigar Association has explained their popularity in similar terms, writing that " '[c]igars are so politically incorrect it makes them more attractive to those who refuse to go along with the herd in today's militant, neo-prohibitionist environment.' " quoted by Joel B. Obermayer, *Cigars Suddenly Hot and Longtime Smokers Are Smoldering,* The News & Observer (Aug. 25, 1996). A recent issue of the upscale cigar magazine "Cigar Aficionado" featured an article drawing parallels between the speakeasies of the 1920s as cultural symbols and the cigar lounges of the 1990s. *Smokin' USA: In the 1920s There Were Speakeasies; In the 1990s There Are Cigar Lounges,* Shandana Durrani, Cigar Aficionado 422 (Winter 1996/97).

The cigar market also appears to have become popular among a broader cross-section of Americans, including younger people and women.[1] Although women account for only 2% of today's 10 million cigar connoisseurs, numerous publications have focused on the significance of the cigar as a feminist symbol. *Tobacco Vogue Women Fire Up Cigars, Put "She" in Hedonism,* Melanie Wells, USA Today (June 25, 1996). By smoking cigars, some say, women are "crashing one of society's last traditional male bastions." *Id.* As for many other cigar smokers, smoking a cigar purportedly evokes an image of power for women. *Id.;* Nelson, *supra.*

Whether the explosion in cigar sales is attributable to "a backlash by '90s voluptuaries ... shaking a stogie at 'this neo-puritan era of chiseled abs and pinched enjoyments,' " Reilly, *supra,* or to more traditional associations between cigar smoking and status and wealth,[2] the current popularity of cigar smoking is undeniable. In New York alone, several new cigar bars have opened; before long, "every neighborhood will have a cigar lounge with humidors for rent." *Another Cigar Lounge Opens,* The New York Times, C2 (Jan. 29, 1997). Just last year two new books about cigars appeared, encouraging cigar neophytes to cultivate a more studied appreciation of cigars through the knowledge of the cigar connoisseurs featured in these books. It is amidst this popularity surge in cigar smoking that counterclaim plaintiff Davidoff brings its Lanham Act claim against JR Tobacco's advertisement based on the latter's advertising brochure for its own line of premium cigars, JR Alternatives. Davidoff has moved for summary judgment, and JR Tobacco has opposed this motion. For the reasons explained below, counterclaim plaintiff's motion is granted.

1. According to the Boston Herald, although "the majority of premium-cigar smokers are well into their 40s, [] there is a sizeable group of under-30 smokers who view the cigar as a new-fangled power-tool." *The Splendor of Stogies: Cigar Aficionados Sit Back, Relax ... and Blow Smoke in the Face of the Anti–Smoking Movement,* Christopher Cox, Boston Herald (Apr. 19, 1995).

2. Cigars have been described as a "yuppie accessory as slick as a Saab, as stylish as Armani, as telling as a pocket phone." Reilly, *supra.*

## II. Background

### A. *JR Tobacco's Cigars*

Defendant and counterclaim plaintiff Davidoff Connecticut along with additional counterclaim plaintiffs Davidoff Switzerland Avo, and Imex (collectively "Davidoff") are related corporate entities engaged in manufacturing and selling premium cigars.[3] Davidoff sells cigars under the registered trademarks of DAVIDOFF, ZINO, AVO, and THE GRIFFIN'S.

Plaintiff and counterclaim defendant is a mail-order cigar company. JR sells name brand cigars, JR private label cigars as well as JR Alternatives cigars. (Rothman Declaration executed March 11, 1996 ("Rothman Decl.") ¶ 2). The President of JR Tobacco, Lewis Rothman, consulted a variety of prominent cigar manufacturers around the world in developing his line of premium cigars, JR Alternatives. Among the manufacturers he consulted are General Cigar Co., Inc., Matasa, and Villazon. (Rothman Decl. ¶ 6). Although these names may be foreign to those uninitiated to the world of cigars, they figure among the most celebrated of South American cigar manufacturers, producing such world famous cigar brands as Macanudo, Partagas, Punch and Rey del Mundo. (*Id.*).

As Mr. Rothman explains, he chose over 175 of what he considered to be the best cigars of the world, organized them into groups of 25, grouping together those similar in size, shape, taste, origin and wrapper color. (Rothman Decl. ¶ 15). According to Mr. Rothman, it is common practice in the cigar business to sell a single cigar under numerous labels at different prices. (Rothman Decl. ¶ 9). After having sorted the cigars into groups, Mr. Rothman requested the manufacturers whom he had consulted to produce, under the JR Alternatives label, a single cigar for each of the 25 groups according to his specifications. (Rothman Decl. ¶ 14).

Among the cigars imitated were the Macanudo line, purportedly the most popular premium brand of cigar sold in the United States. Mr. Rothman suggests that DAVIDOFF, AVO and THE GRIFFIN'S are simply copies of Macanudo cigars. (Rothman Decl. ¶ 16).

Mr. Rothman assigned one JR Alternative cigar to each of the 25 groups based on similarity of size, shape, taste, origin and wrapper color. (Rothman Decl. ¶ 15). In JR's promotional material, JR displays photos of the original name brand cigar it has aspired to imitate as well as its own alternative to this brand.

### B. *JR Tobacco's Promotional Material*

JR promotes its premium cigars in a color brochure and a catalogue attached to the brochure. These materials are systematically included with mail-order purchases of non-premium cigars from JR. Upon visiting a JR Tobacco store, one can request a brochure from the store clerk. (Rothman Decl. ¶ 3). One can also obtain a brochure by calling JR and specifically requesting one, although as of December of 1996, because of a sharp increase in demand, JR was not accepting any new orders nor was it sending any brochures to new customers.

The cover of the brochure displays several well known cigar brands juxtaposed to one JR Alternative cigar. The first two pages of this glossy 31-page brochure feature a description of the current market for premium cigars as well as an explanation of how JR Alternatives are designed and manufactured. Davidoff bases its Lanham Act counterclaim on numerous statements contained in this explanation. Among the statements Davidoff claims are patently false are the underlined portions of the following excerpts from the brochure:

(1) As importers and local retailers have intensified their efforts to trade their clientele up to newer and more expensive "labels," we, at J*R have scoured the cigar producing world to bring you *those same products* at lower prices under our own "labels."

---

3. Generally, a premium cigar can be distinguished from other cigars on the basis that it is handmade. (Deposition of Lewis Rothman sworn to on October 27, 1995 ("Rothman Dep.") at 210).

(2) In many instances the cigars sold under the *super* premium label, the premium label, and *our J\*R label are the identical product!*

(3) J\*R has gone to the most respected and reliable cigar manufacturers with impeccable credentials (*the very people who produce the majority of the world's most famous cigar brands*) and we've ordered MILLIONS of handmade Jamaican, Dominican, and Honduran cigars.

(4) J\*R had more than 175 of the most famous cigars in the world *duplicated, as closely as possible, in size, shape, taste, origin, and wrapper color.* You'll find we have a J\*R Alternative to just about anything worth smoking—at a fraction of *the original* price!

(5) All J\*R Alternatives are packed 20 cigars per box regardless of *how the original cigar we have duplicated* is packed.

(6) The pictures shown are the actual size of the *real* cigars we have *copied.*

(Rothman Decl., Ex. A). All these statements appear in the first two pages of the brochure in a narrative explaining the "dramatic escalation of retail cigar prices" followed by a description of how the company went about creating JR Alternatives, subtitled "Here's what we've done." (*Id.*)

Davidoff also points to statements made within the body of the brochure to support its claim. Page 26 features JR's "Cuban Alternative Story," as well as four brands of Cuban cigars to which JR markets a series of Alternatives. After an historical preface recalling the trade embargo imposed in 1961 against Cuba and the subsequent scarcity of Cuban cigars in America, the brochure explains:

> In early 1989, we gathered samples of many of the legendary Cuban brands and sent them to F. Palicio & Co., in Honduras. These samples were then disassembled by a team including Frank Llaneza, a world famous cigar manufacturer, Estello Pa-

dron, a Cuban expatriate master cigar maker, and John Oliva of Oliva Tobacco, who is one of the world's foremost authorities on tobacco leaf. These three set about to create tobacco blends which would *duplicate* the taste of the various famous Havanas, as well as the look of the wrappers characteristic to each brand. On the following pages you will see the results of their work....

(Rothman Decl., Ex. A). Next to this narrative are photos of seven Cuban cigars manufactured by Bolivar, Cohiba, Davidoff and Diplomaticos. Finally, Davidoff also challenges the statements contained on the packaging label affixed on each fiberboard box of cigars:

> Custom made for JR Tobacco by the world's oldest, largest and most prestigious manufacturers. Our fine cigars are painstakingly hand made to be comparable in size, shape, taste and blend to the famous brand shown above at a fraction of the original retail price.

(Rothman Decl., Ex. B). Together with the introductory language of the brochure, these are the statements upon which Davidoff bases its Lanham Act counterclaim.[4]

## III. Standard Applicable to Motion for Summary Judgment

Under rule 56(c), "[a] motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994); see Fed.R.Civ.P. 56(c). *See generally Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome

---

4. Because the context of these statements is critical to ascertaining their veracity or falsity, a complete copy of the brochure is annexed as "Appendix A." [Editor's Note: Appendix not reproduceable for purposes of publication.]

of the particular litigation if application of the relevant substantive law requires their determination. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

"A party who moves for summary judgment has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996); *accord Chambers,* 43 F.3d at 36. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," however, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *accord Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The moving party, in other words, does not bear the burden of disproving an essential element of the nonmoving party's claim.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "affidavits, depositions, or other sworn evidence as permitted by Fed. R.Civ.P. 56, setting forth specific facts showing that there exists a genuine issue of material fact." *Rule,* 85 F.3d at 1011; *accord* Fed.R.Civ.P. 56(e); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir. 1994). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Instead, the nonmovant must " 'come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely … on the basis of conjecture or surmise.' " *Trans Sport v. Starter Sportswear,* 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

"In ruling on a motion for summary judgment, the district court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." *Id.; accord Chambers,* 43 F.3d at 36. "The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried." *Rule,* 85 F.3d at 1011. Accordingly, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Id.* Similarly, "[a]ny weighing of the evidence is the prerogative of the finder of fact." *Id.* "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a *reasonable* inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers,* 43 F.3d at 37 (emphasis added).

## IV. Counterclaim Plaintiff's Lanham Act Claim

### A. *The Lanham Act*

The Lanham Trademark Act prohibits "commercial advertising or promotion [that] misrepresents the nature, characteristics, qualities or geographic origin of [the advertiser's] or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).[5] For a movant's claim to succeed under § 43(a), that party must demonstrate either that "(1) the advertising is literally false as a factual matter, or (2) al-

---

**5.** The full text of 15 U.S.C. § 1125(a) reads as follows:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

though the advertisement is literally true, it is likely to deceive or confuse consumers." *Lipton v. The Nature Company,* 71 F.3d 464, 474 (2d Cir.1995) (citing *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir.1991)). Counterclaim plaintiffs have moved for summary judgment on the ground that JR Tobacco's advertisements are literally false.

## B. Literally False Advertising

To recover under the first of the two alternative theories of false advertising under the Lanham Act, plaintiff must demonstrate that an advertisement is literally false.[6] *Johnson & Johnson v. GAC International, Inc.,* 862 F.2d 975, 977 (2d Cir.1988) (citing *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 317 (2d Cir.1982)). In determining whether the text of an advertisement is literally false, I must consider the context of the advertisement. *Avis Rent A Car System v. Hertz,* 782 F.2d 381, 385 (2d Cir.1986) (reiterating the Supreme Court's invective against "the tyranny of literalness"); *Vidal Sassoon v. Bristol–Myers Co.,* 661 F.2d 272, 276 (2d Cir.1981) (stating that court must view the "entire mosaic" of the advertisement rather than "each tile separately") (citation omitted); *American Home Products Corp. v. Abbott Laboratories,* 522 F.Supp. 1035, 1040–45 (S.D.N.Y.1981) (stating that court must consider context of advertisement in ascertaining its literal meaning). Determining just how much "text must yield to context," however, is an extremely difficult task—one almost impossible to accomplish without succumbing to the pitfalls of deconstructionism or becoming mired in a debate over semeiotics. *Avis,* 782 F.2d at 385. I must look beyond the mere words within the text, yet I cannot consider the "commercial context, the defendant's prior advertising history, and the sophistication of the advertising audience." *Johnson & Johnson\* Merck Consumer Pharmaceuticals Co. v. SmithKline Beecham Corp.,* 960 F.2d 294, 298 (2d Cir.1992) (citing as factors to be used in determining whether an advertisement is

likely to mislead or confuse public, not to determine literal falsity). To reach that delicate balance between the literal text and the context of an advertisement, counterclaim defendants urge embracing as much context as it would require to disclaim the common meaning of the words used in their advertisements. To embrace this much context, however, would effectively blur the distinction between an advertisement that is literally false and one that, although true, is likely to mislead the consumer public.

I decline to consider as much context as counterclaim defendants urge. Instead, each challenged portion of JR Tobacco's advertisement will be scrutinized within a meaningful and reasonable context, including not only the entire sentence of each portion of challenged text but also the entire text and overall message of the brochure. In determining the correct approach to ascertaining whether JR Tobacco's advertisements are literally false, I rely in particular on a number of Lanham Act claims that have arisen in the context of comparative advertising.

Lanham Act claims frequently arise in the context of one manufacturer's comparison of its product with another manufacturer's product. *See Conopco v. Campbell,* 95 F.3d 187 (2d Cir.1996) (Lanham Act claim brought by manufacturer of Ragu pasta sauce against manufacturer of Prego pasta sauce); *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312 (2d Cir.1982) (Lanham Act claim brought by owner of Minute Maid orange juice against owner of Premium Pack orange juice); *Vidal Sassoon v. Bristol–Myers Co.,* 661 F.2d 272 (2d Cir.1981) (Lanham Act claim brought by manufacturer of Vidal Sassoon shampoo against manufacturer of Body on Tap). Often, a manufacturer claims to have copied a more successful or well known manufacturer's product. *See, e.g., Johnson & Johnson v. GAC International, Inc.,* 862 F.2d 975 (2d Cir.1988); *Smith v. Chanel, Inc.* ("Chanel I"), 402 F.2d 562, 565 (9th Cir. 1968); *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores,* 299 F.2d 33 (2d

---

**6.** Thus, mere puffing (however aromatic or tasty in this case) is not actionable; nor are subjective claims, because they cannot be proven true or false. *Lipton,* 71 F.3d at 474 (citing *Groden v.*

*Random House, Inc.,* No. 94 Civ. 1074, 1994 WL 455555, at \*5 (S.D.N.Y. Aug. 23, 1994), *aff'd,* 61 F.3d 1045 (2d Cir.1995)).

Cir.1962); *Sherrell Perfumers, Inc. v. Revlon, Inc.*, 483 F.Supp. 188 (S.D.N.Y.1980); *Chanel, Inc. v. Smith*, 178 U.S.P.Q. 630, 1973 WL 19871 (N.D.Cal.1973). A manufacturer's advertising claims may pertain to the equivalence of two products, or they may pertain to the steps taken in manufacturing a product to ensure the equivalence or superiority of one product to another product. JR's advertising claims fall into the latter category.

■ Where an advertisement makes a claim of equivalence between two products, the veracity of the literal meaning of the advertisement rests upon a demonstration of the equivalence of those two products. Typically, scientific and expert evidence is submitted to demonstrate equivalence. *Revlon, Inc.*, 483 F.Supp. at 192–93 (relying on gas chromatographs submitted to ascertain nonequivalence of perfume products). Where a manufacturer claims to have undertaken certain steps to achieve an equivalent or similar product, however, the veracity of the literal meaning depends upon whether those steps have in fact been taken. *Coca–Cola*, 690 F.2d at 318 (stating that advertisement's representation that product is made by pouring the freshly-squeezed juice directly into the carton "is not a true representation of how the product is prepared"); *Vidal Sassoon*, 661 F.2d at 274–77 (holding that advertisement's description of how consumer preference test upon which claim of preference was based was literally false because test not conducted as suggested by ad).

The language of the brochure communicates very clearly that JR, together with General Cigar, Inc. and other experts, has taken affirmative steps to duplicate the best cigars of the world. Thus, JR's representations go beyond a mere claim of equivalence to claim a certain amount of work has been performed in an effort to duplicate the original. Despite JR's recourse to Webster's dictionary to suggest that "duplicate" means something less than its common sense meaning, the meaning of this word of comparison is "clear and unequivocal." *Revlon, Inc.*, at 191. While JR focuses on the noun "duplicate" to suggest that the resulting product is similar to the original, JR has used "duplicate" as a verb in the brochure, which suggests an affirmative effort has been made to determine and simulate the process and materials used to create the original product. Furthermore, the 29 pages of photographs of cigars that follow indicate unambiguously that the cigars photographed are the cigars JR has attempted to "duplicate." Among these photos are at least six photos of Davidoff cigars, suggesting that Davidoff cigars were among the cigars gathered in JR's cigar round-up and subsequently "duplicated." Through the repeated use of words such as "duplicate," "same," "copy," and "identical", this is the general or overall sense conveyed by the six statements at issue in Davidoff's Lanham Act claim. The context of these statements, the entire brochure together with its photos, does nothing to change this message, and, in fact, reinforces it.

According to *Chanel I*, the "use of another's trademark to identify the trademark owner's product in comparative advertising is not prohibited by either statutory or common law, *absent misrepresentation regarding the products*." *Chanel I*, 402 F.2d at 565; *Boussac*, 299 F.2d at 36 ("The Lanham Act does not prohibit a commercial rival's truthfully denominating his goods a copy of a design in the public domain, though he uses the name of the designer to do so."). The Ninth Circuit even went so far as to stress the public benefit of the copycat's work, stating that "the copyist, albeit unintentionally, serves an important public interest by offering comparable goods at lower prices." *Chanel I*, 402 F.2d at 568. The holding was premised, however, on the literal truth of the advertisement's claim. Thus, the court noted that "if appellants' specific claims . . . are false, appellees may have a remedy under § 43(a) of the Lanham Act." *Id.* at 569 n. 25. To determine whether JR is entitled to display the Davidoff trademark, I must first determine whether each of JR's advertising statements is literally true or false. In other words, on this motion I must determine whether there exists a material issue of fact as to whether the steps that JR has claimed to have undertaken in duplicating original brand name cigars have in fact been taken.

### 1. Group One of JR's Advertising Statements

Rather than address each statement separately, the statements will be discussed in groups. Statements numbered one, four, five, and six on page seven, *supra*, as well as the reference to duplication contained in the Cuban narrative on page 26 of the brochure form the first group. The first four appear in the introductory letter from Rothman on the inside cover of the brochure. Because the fourth statement in this group makes the most specific claim with respect to how JR Alternatives were made, this statement will be examined first. Both parties agree that the specificity of the claims made in statement four, when read in the context of this introductory letter, modify and refer to the more general references of duplication in statements one, five, six and the Cuban narrative. Thus the interpretation of the veracity or falsity of the fourth statement will, to a certain extent, be determinative of the meaning of the other statements in this group.

In statement number four, JR claims to have duplicated these cigars "as closely as possible, in size, shape, taste, origin and wrapper color." At oral argument, JR contended that the modifying phrase "as closely as possible" softens its claims of duplication and thereby subjects the claims to a lower standard. I disagree. To duplicate "as closely as possible" suggests not only that assertive steps to duplicate have been taken but also that all steps possible to duplicate have been taken—an even greater effort than average has been made. JR has represented that it took aggressive measures to duplicate the original cigars photographed in its brochure with respect to origin, taste, size, shape and wrapper. The record demonstrates, however, that only efforts with respect to the duplication of the size, shape and wrapper color were made.[7]

#### a. *Origin*

Although Rothman states in his affidavit that "the original [cigar] is duplicated by the ALTERNATIVE, as 'closely as possible,'

with respect to the five listed characteristics: 'size, shape, taste, origin, and wrapper color,'" (Rothman Aff., ¶ 10), he contradicts this statement in other sworn testimony. Although JR argues that the reference to origin refers to the country of origin only, JR overlooks the effect of the modifying phrase "as closely as possible" on the claim. With respect to origin, to duplicate "as closely as possible" means that not only is JR aware of the country of origin of the tobacco, but, more specifically, that it is aware of and has attempted to duplicate the particular region and regional conditions under which the tobacco is harvested—an aspect of the origin of the product that is integrally related to the quality of the product. In his deposition, Rothman explains that conditions vary within one country from season to season as well as from region to region and that these differences affect the characteristics of the tobacco. (Rothman Dep. at 197–99, 203). Therefore, even if JR had taken steps to ensure that its leaves were from the same country of origin as Davidoff's leaves, this alone would not suffice to verify a claim of having duplicated the cigars "as closely as possible" with respect to origin. Rothman made no effort to ascertain the origin of the tobaccos used in Davidoff cigars. (Rothman Dep. at 223, 415–22). Rothman concedes that the Alternatives are not purchased from the same factories that make genuine Davidoff cigars. (Rothman Dep. at 366). JR's Alternative to Davidoff's cigars, manufactured in the Dominican Republic, are made in Jamaica. (Rothman Dep. at 322, 442–43). Although the location of the rolling factory may be less significant than the precise origin of the tobacco leaves themselves, JR, by its own admissions, has duplicated neither.

Similarly, General Cigar, Inc., the cigar manufacturing expert touted in JR's brochure and responsible for the production of the majority of JR's Alternatives, conceded that it "could not and does not make any attempt to duplicate the original brand name cigar to which JR Alternatives will be offered as alternatives." (Affidavit of John Rano of

---

7. In fact, JR solicited from General Cigar primarily by size: "I told him I wanted to make, you know, the various sizes that I needed, you

know, 6 and a half by 42 or 6 by 50 and so forth." (Rothman Dep. at 225).

General Cigar, Inc. sworn to on February 13, 1996 ("Rano Aff."), ¶ 4). Furthermore, General Cigar "could not and does not conduct any research or investigations concerning the tobacco blends or sources of tobacco used in the brand name cigars as they may relate to JR Alternatives." (*Id.*). Therefore, because the record demonstrates that JR has not taken the steps that are represented by the brochure, statement four is literally false with respect to origin.

b. *Taste*

The record reveals no basis for JR's claims with respect to taste duplication of Davidoff cigars. Rothman attempts to qualify its claims of duplication through a somewhat complicated application of transitive logic. Rothman posits that because many cigar makers, including Davidoff, have copied Macanudo, JR's creation of cigars "substantially equivalent" to Macanudo means that JR must also have "duplicated, as closely as possible" the taste of Davidoff cigars. (Rothman Aff. ¶ 17). The description of the cigars in the brochure, however, directly contradicts this assertion; the Macanudo cigar is described at page fourteen as a "light bodied" cigar, while the Davidoff cigar is described at page seven as a "mild to medium bodied" cigar. Thus, even if JR had submitted evidence tending to show that Davidoff cigars were nothing but an imitation of Macanudo, this is not the representation made in the JR brochure. Furthermore, both Rothman and General Cigar admit that they made no effort to duplicate the taste of Davidoff cigars. (Rothman Dep. at 223–24, 415–22; Rano Aff.

¶ 4). This flatly contradicts the representation of the brochure that JR has taken affirmative steps to duplicate the taste of Davidoff cigars.

In Rothman's deposition, Rothman repeatedly evokes the image of a chef's pasta sauce to describe a particular tobacco blend's taste. (Rothman Dep. at 189, 201, 205–08, 229–30, 415). The analogy is persuasive—as the taste of a sauce depends upon the success of a tomato harvest and changes with the seasonal conditions affecting the tomatoes, so the taste of the filler of a cigar may vary with soil and climatic changes. Rothman overlooks the fact, however, that a company marketing a particular pasta sauce, or even a chef serving his or her own sauce in a restaurant, rarely claims to have "duplicated" or to have taken affirmative steps to duplicate another sauce. A company would be wise to suggest either that its sauce is the best or tastiest sauce, subjective and unverifiable puffery that falls outside the scope of Lanham Act scrutiny, or that its sauce is the thickest, an objective claim that might be verified and even shown on a television commercial.[8] Rothman concedes the difficulty of ascertaining the exact ingredients in a sauce,[9] but fails to acknowledge that chefs rarely make such claims. Because the brochure represents that JR took steps to duplicate and the record reveals no concerted effort to ascertain the composition of what is represented to have been duplicated, statement numbers one, four, five, six, and the indicated portion of the Cuban narrative are all literally false.

8. In *Conopco v. Campbell Soup Co.*, 95 F.3d 187 (2d Cir.1996), Conopco, manufacturer of Ragu pasta sauce, brought a Lanham Act claim against Campbell, manufacturer of Prego spaghetti sauce. Both parties conceded that a visual comparison of two particular varieties of Ragu and Prego pasta sauce in Campbell's advertisements was truthful—at issue was Campbell's television commercial advertisement supposedly claiming that Prego is thicker than all varieties of Ragu pasta sauces. *Id.* at 190. The issue of consumer confusion was never fully addressed because judgment was granted and later affirmed on the ground of laches. *Conopco v. Campbell Soup Co.*, No. 93 Civ. 4245, 1994 WL 88051 (S.D.N.Y. March 11, 1994), *aff'd*, 95 F.3d 187 (2d Cir. 1996).

9. The following is excerpted from page 415 of Rothman's deposition in response to a question concerning another cigar manufacturer's comparisons of JR Alternatives with Davidoff's and Griffin's:

Rothman: It makes no difference to me what he thinks is in our cigars. I rely on the people who actually made the cigar. I doubt if the finest chef in the world can look at somebody's spaghetti sauce and determine what the ingredients were. They can just tell you if it tastes good or not.
Question: Do you know what's in your Alternatives?
Rothman: Sugar and spice and everything nice.

Although the broader context—the current trends within the cigar market—reveals that perhaps a number of people smoke cigars for sheerly cosmetic reasons and may very well be unable to distinguish a Cuban Cohiba from a JR Alternative, this cannot excuse the falsity of the statements contained in JR's brochure. Nor does Rothman's claim that the target audience of the JR brochure consists of knowledgeable cigar smokers make the patent falsity excusable. (Rothman Decl. ¶ 3). In fact, Mr. Rothman conceded in other sworn testimony that he "made no assumptions about the knowledge of those who read this catalog as to the workings of the cigar industry[.]" (Rothman Dep. at 378). Regardless of the sophistication JR attributes to its audience,[10] purchasers are entitled to truthful statements concerning the efforts made by JR to duplicate other cigars. The claims of duplication contained in statements one, four, five, six and the Cuban narrative are patently false. Therefore, counterclaim plaintiff's motion with respect to these statements is granted.

### 2. Group Two of Advertisement Statements

■ The statement numbered two on page seven, *supra*, comprises the whole of group two. Statement number two is perhaps the boldest and most specific of any of the claims made in JR's brochure. JR states that "[i]n many instances the cigars sold under the super premium label, the premium label, and the JR label, are the identical product." (Rothman Decl., Ex. A)

#### a. *Context for Group Two*

The appropriate context for this statement is the brochure as a whole. Rothman attempts to modify the meaning of this statement by claiming that it refers to JR private label cigars rather than JR Alternatives. (Rothman Decl., ¶ 9). The statement appears, however, on the same page as and directly under a large bold-faced title announcing "Introducing ... THE NEW ALTERNATIVES." Although statement two

does not expressly refer to the Alternatives, "the Lanham Act encompasses more than blatant falsehoods. It embraces 'innuendo, indirect intimations, and ambiguous suggestions.'" *Vidal Sassoon*, 661 F.2d at 277 (citation omitted). The placement of the statement directly under this bold-faced title compels the conclusion that the statement refers only to JR private label cigars.

#### b. *Veracity of the Statement*

The record does reveal that in some instances JR has achieved a product identical to a premium or super premium cigar. (Rothman Dep. at 355–65). Rothman identified a handful of instances in which the super premium, premium and JR Alternative were in fact the same cigar. Rothman was unable, however, to identify any instances in which the original featured in the photograph and the JR Alternative represented the same product. (Rothman Dep. at 365–69). Considering the context of the second statement, the second statement is also literally false. Therefore, defendants' motion with respect to the second statement is granted.

### 3. Group Three of Statements

■ Statement three comprises the whole of group three. JR claims that it "has gone to the most respected and reliable manufacturers with impeccable credentials (the very people who produce the majority of the world's most famous cigar brands) and we've ordered *MILLIONS* of handmade Jamaican, Dominican, and Honduran cigars." (Rothman Decl., Ex. A). The portion of the statement that Davidoff challenges is the parenthetical within the sentence. Taken in its context, JR is stating that the people it has consulted—individuals from General Cigar, Inc., Villazon, and Matasa—are the people who produce the majority of the world's most famous cigar brands. Unlike the subjective claims made outside of the paragraph, namely the reference to the most respected and reliable manufacturers, the claim that these people produce the majority of the world's most famous cigar brands is an objective

---

10. To consider the level of sophistication of JR consumers to the extent JR urges us would confuse the distinction between a Lanham Act claim based on literal falsity and one based on consumer confusion.

claim and, therefore, subject to verification. Because Davidoff has produced no evidence to suggest that the manufacturers JR consulted are not responsible for producing the majority of the world's most famous cigar brands, Davidoff has failed to demonstrate that this statement is literally false. Therefore, Davidoff's motion with respect to statement number three is denied.

## V. JR's Box Label

■ For the same reasons that the statements in group one are literally false, the claims made on the box label with respect to origin and taste are also literally false. In addition, JR claims to have duplicated the blend of the original cigar to which it offers an alternative. The record makes abundantly clear that JR has made no effort to duplicate the blends of the cigars it imitates. Rothman conceded repeatedly in his deposition that JR did not know the blends of tobacco used in Davidoff cigars nor had it made any efforts to determine the blend of tobaccos used. (Rothman Dep. at 200–03, 223, 267, 415–22). Therefore, the challenged portion of JR's box label is also literally false, and Davidoff's motion with respect to the box label is granted.

## VI. Plaintiff's Use of Davidoff Trademark and Photographs of Davidoff Cigars

■ Throughout JR's brochure, JR shows both the photographs and trademarks of other cigar manufacturers. According to *Boussac,* a party may refer to the brand name of the original product if the imitator has "truthfully and faithfully copied the original." *Boussac,* 299 F.2d at 35–36; *see also Cuisinarts, Inc. v. Robot–Coupe Int'l Corp.,* 509 F.Supp. 1036, 1042 (S.D.N.Y.1981) (prohibiting rival company from using competitor's trademark in its advertising if advertising contains falsehoods regarding relationship between two competitors' products). Davidoff has demonstrated that JR has not truthfully and faithfully copied the original. Even assuming JR had by coincidence duplicated the taste of Davidoff cigars, its failure to take affirmative steps to duplicate the taste and origin of the Davidoff cigars clearly demonstrates that JR has not faithfully copied Davidoff cigars. Furthermore, because JR's brochure does create confusion with respect to the relationship between Davidoff's and JR's products—*i.e.,* whether they are duplicates of each other—JR is prohibited from using Davidoff's trademarks in its brochure. *See Cuisinarts, Inc.,* 509 F.Supp. at 1042.

The photographs of the original cigars are a central feature of JR's brochure. Together with the claim of having duplicated the original brand name cigars, these photographs form an integral part of the literal falsehood of the advertisement—that JR has taken affirmative steps to duplicate the taste, origin, wrapper and color of other brand name cigars. Although JR never claims to be the manufacturer of the cigars photographed, because it has claimed to have duplicated them, it is using the photograph of its rival's product to sell its own product, which is prohibited under the Lanham Act unless the manufacturer has faithfully copied the original. *Boussac,* 299 F.2d at 35–36; *Matsushita Elec. Corp. v. Solar Sound Sys., Inc.,* 381 F.Supp. 64, 67 (S.D.N.Y.1974) (stating that the "use of a photograph of another's product to advertise and sell one's own product constitutes a violation of section 43(a)"). Therefore, Davidoff's motion with respect to JR's use of the trademark and photographs of Davidoff's cigars is granted.

## VII. JR's Disclaimers

■ Although disclaimers are preferred to "blanket proscriptions of speech", generally, a disclaimer is ineffective to cure a literally false statement. *Tambrands, Inc. v. Warner–Lambert Company,* 673 F.Supp. 1190, 1195 (S.D.N.Y.1987); *see also Coca–Cola v. Tropicana,* 690 F.2d 312, 318 (2d Cir.1982); *George Washington Mint, Inc. v. The Washington Mint, Inc.,* 349 F.Supp. 255, 262 (S.D.N.Y.1972). Furthermore, the Court of Appeals has recognized that disclaimers are particularly ineffective where a discount imitator of brand-name goods attempts to disabuse the unwary customer. *Charles of the Ritz Group Ltd. v. Quality King Distrib., Inc.,* 832 F.2d 1317, 1324 (2d Cir.1987); *Oral–B Laboratories, Inc. v. Mi–Lor Corp.,* 810 F.2d 20, 22 (2d Cir.1987).

JR's disclaimer is printed in small type beneath the large boldface display of the Davidoff trademark and reads as follows: "The J*R Alternative is not associated in any way with Davidoff, a registered trademark of Davidoff of Geneva." (Rothman Decl., Ex. A). Disclaiming any affiliation between the companies does little if anything to rectify a patently false claim of duplication. The falsehood asserted by Davidoff does not concern the corporate affiliation between Davidoff and JR or the true proprietor of the Davidoff trademark, but rather the efforts taken to ensure the similarity of quality between the two rivals' products. Therefore, JR's disclaimers do not effectively cure the literal falsehoods communicated by the text of the brochure.

## CONCLUSION

The motion of the Davidoff counterclaim plaintiff for summary judgment is granted with respect to (i) certain of the statements in the brochure, (ii) JR's use of trademarks and photographs of Davidoff cigars, and (iii) JR's box label. Counsel shall confer and advise the Court by letter no later than March 7 of the steps necessary to resolve this action.