**AVIS RENT A CAR SYSTEM, INC.,**
Plaintiff-Appellee,

v.

**The HERTZ CORPORATION,**
Defendant-Appellant.

No. 85–7692.

United States Court of Appeals,
Second Circuit.

Argued Nov. 6, 1985.

Decided Feb. 3, 1986.

Douglas D. Broadwater, New York City (Thomas D. Barr, Kathleen L. Beggs, Alan B. Vickery, Cravath, Swaine & Moore, Lane & Mittendorf, New York City, of counsel), for defendant-appellant.

Steven J. Stein, New York City (Barry G. Felder, Steven M. Kayman, Anita J. Zigman, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for plaintiff-appellee.

Before FRIENDLY, TIMBERS and PRATT, Circuit Judges.

FRIENDLY, Circuit Judge.

Avis Rent A Car System, Inc. ("Avis"), plaintiff in this action in the District Court for the Eastern District of New York claiming false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[1] has long proclaimed to the world that it is Number 2 in the car rental business. Defendant, The Hertz Corporation ("Hertz"), has just as loudly proclaimed that it is Number 1. The two giants have found themselves locked in hostile embrace as a result of a print advertisement that Hertz published in March and April 1984.[2]

The advertisement was an eye-catcher. It began by proclaiming at the top in large, bold type:

---

[1] This reads:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The complaint also alleged, as a pendent claim, a violation of the New York false advertising statute, N.Y.Gen.Bus.Law § 350, but Avis did not pursue its claim under that statute.

[2] The advertisement was published on the back covers of the March and April editions of "The American Way," the American Airlines in-flight

> **Hertz**
>
> **has more new cars**
>
> **than Avis has cars.**

Centered under this was an underscored statement in italics:

> *We're rolling out over*
> *135,000 1984 cars.*

Next came a photograph showing mechanics shepherding a truckload of apparently new cars into an airport parking lot. The text went on as follows:

> If you'd like to drive some of the newest cars on the road, rent from Hertz. Because we have more new 1984 cars than Avis or anyone else has cars—new or old.* [3]
>
> Take off in a luxurious Continental Mark VII or a sporty Thunderbird with AM/FM stereo. Put the top down on a Mustang convertible with cruise control. Or cover a lot of ground in an economical Escort.
>
> Whether you're renting for business or pleasure, chances are you'll find a domestic or imported car you'll want to drive.
>
> So call your travel agent or Hertz at 1-800-654-3131. And take an '84 out for a test drive.

The advertisement concluded with an underscored statement in large, bold type:

> **The #1 way to rent a car.**™

and under that a statement in ordinary type:

Hertz features the exciting Ford Thunderbird.

Avis promptly brought this action on March 16, 1984, alleging that the statement "Hertz has more new cars than Avis has cars" in the advertisement's heading was false and seeking to enjoin further publication of the advertisement and to recover damages. After hearings in April and May, the district court issued findings of fact and conclusions of law on August 6, 1984.[4] At a pretrial hearing on August 17, the court orally ordered Hertz not to publish the advertisement during the pendency of the litigation. A trial lasting several days took place in September and November. On January 7, 1985, the court entered new findings of fact and conclusions of law to the effect that Hertz' claim that it had more new cars than Avis had cars was false—though not intentionally so, having been predicated on a study giving Hertz a reasonable expectation that the claim would be true as of sometime early in 1984. *See infra* note 8. After a further hearing devoted to fashioning appropriate injunctive relief,[5] the court entered a two-part injunction on January 24, 1985. One part enjoined Hertz

> from employing [in] Hertz' advertising or promotional material, or otherwise in connection with Hertz' marketing or sales efforts, (1) any statement or representation comparing Hertz' fleet size or composition to Avis' fleet size or compo-

---

magazine, new editions of which are placed on board on the first of each month; in the March 12 issue of the national edition of *The Wall Street Journal;* in the April-June edition of the "Hertz Worldwide Directory"; in the March 12 and 13 issue of the *Palm Springs Desert Sun;* in the March edition of the "Palm Springs Guide"; and in the April issue of "Golf Magazine."

In addition to the print advertisement, Hertz aired a radio commercial that made the claim, "This year, we're rolling out 135,000 shiny, new 1984 cars. That's more dependable new cars than Avis or anyone else has cars—new or old." Designed to "kick off" the print advertising campaign, this commercial was broadcast from February 27, 1984, through the middle of March 1984. The district court held that Hertz' radio commercials did not violate the Lanham Act, finding that they "were based upon reasonable

expectations of the future and did not constitute false statements concerning existing facts."

3.  The asterisk directed the reader to a footnote, in small type, immediately following the text, which read: "Based on car registration and major airport market share statistics." This footnote appeared in all the advertisements except the one on the back cover of the March edition of "The American Way," from which, according to Hertz, it was mistakenly omitted.

4.  These were later voided as premature and replaced by substantially identical findings of fact and conclusions of law issued on January 7, 1985.

5.  As is common in cases of this sort, Avis had been unable to establish damages.

sition that is false or misleading; and (2) any statement or representation comparing Hertz' fleet size or composition to Avis' fleet size or composition that is not verified and accurate at the time such statement or representation is made.

The other part directed Hertz to publish in each of the media in which it had published the offending advertisement a notice in a form prescribed by the court. The notice, after reciting that in March 1984 Hertz had advertised in the particular journal the claim that "Hertz has more new cars than Avis has cars," went on to say: "This representation was a projected claim which was not true at the time it was made." The notice concluded with a paragraph saying that it was being published at Hertz' expense pursuant to the order of the court. Hertz has appealed.

## DISCUSSION

Counsel for both parties have devoted the bulk of their briefs and arguments to Hertz' claim that the district court should not have issued either the negative or the mandatory injunction—the former because there was insufficient evidence that Hertz would repeat the challenged conduct, and the latter because the advertisement had not created a false impression sufficiently enduring to warrant such drastic relief. However, Hertz also presses the point that the judge was able to arrive at his determination of falsity only by counting as part of

the Avis fleet cars that had been removed from availability for rental and had been earmarked for sale as of the date the advertisement was first published, whereas the advertisement, properly construed, made a comparative claim not about the total cars owned by the two companies but about those available for *rental*. Had the judge counted cars in accordance with the latter construction of the advertisement, Hertz argues, he would have found that the claim was true when made. Since we are persuaded that, for reasons developed below, it was clear error for the judge to construe the advertisement as he did, we reverse the judgment and direct dismissal of the complaint without reaching the arguments as to the propriety of the injunction if the necessary factual predicate had been laid.

The determinative question is whether the challenged claim in the advertisement referred to the rental fleets or the total fleets of the two companies. If it referred to the total fleets, as the judge concluded, the advertisement was false since, as he permissibly found:

10. In the period immediately following March 1, 1984 Hertz had 91,000 1984 model cars in its corporate fleet and approximately 6,000 in its licensee fleet, for a total of 97,000, while Avis continued to have approximately 102,000 cars in its corporate and licensee fleet.[6]

6. The judge also made the following findings:
  8. Hertz had no more than 90,141 1984 model cars as of February 29, 1984 (84,199 corporate cars and 5,942 licensee cars).
  9. Avis had 103,049 cars as of February 28, 1984 (75,446 corporate cars and 27,603 licensee cars).
Taken together, these findings show Hertz with 12,908 fewer 1984 cars than Avis had total cars as of February 29, 1984, whereas Finding No. 10, quoted in the text, shows the gap narrowed to only approximately 5,000 cars as of "the period immediately following March 1, 1984"—roughly one day later.
  Avis argued below that the "overnight" surge in Hertz' corporate fleet from 84,199 to 91,000 new 1984 cars was incredible and cast doubt on the accuracy of the figures reported in Finding No. 10. However, the record affords no ground for discrediting those figures. The figures for

the corporate fleet in Finding No. 10 were taken from a vehicle inventory listing, complied by Hertz, which showed 91,134 new 1984 cars in active service as of March 1, 1984. The figures for the corporate fleet in Finding No. 8 were arrived at by Avis' manually totaling the number of cars listed by Hertz as having been placed in service on March 1—6,935 cars—and then subtracting that number from 91,134. The fact that these 6,935 cars had an in-service date of March 1, however, does not mean that they arrived en masse on the Hertz rental lots during the 24-hour period after February 29. Craig Koch, executive vice president and general manager of Hertz' domestic rent-a-car division, explained that the in-service date reflects when a car is first rented, not when it is delivered. Moreover, he testified that for accounting reasons local managers will often delay placing cars delivered near the end of one month in service until the first of the next month. The figures in Finding

However, the figure of 102,000 cars for Avis included approximately 5503 cars in Avis' corporate fleet[7] and approximately 1273 cars in its licensee fleet that the record shows were in the process of being sold and were no longer available for rental. Deduction of these 6776 cars would mean that in the period immediately following March 1, 1984, Avis had only approximately 95,224 cars available for rental as against Hertz' 97,000 new 1984 cars, all but a small number of which were available for rental. Hence, if the advertisement compared the number of 1984 cars that Hertz had available for rental with the total cars that Avis had so available, the advertisement was facially true, though not to the same extent as Hertz had reasonably supposed it would be by that point in time and as it shortly became.[8]

Although argument could be made to the contrary, see, e.g., Antilles Steamship Co. v. Members of American Hull Insurance Syndicate, 733 F.2d 195, 203–07 (2 Cir. 1984) (Newman, J., concurring) (question how a reasonable person would understand a writing is one of "textual interpretation" and should be treated as a matter of law), we will assume arguendo, see Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317–18 (2 Cir.1982), that the district judge's determination of the meaning of the advertisement was a finding of fact that "shall not be set aside unless clearly erroneous." F.R.Civ.P. 52(a). This means, in the classic language of United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), that we may not reverse the judge's finding that the advertisement referred to all

cars rather than cars available for rental unless on the entire evidence we are "left with the definite and firm conviction that a mistake has been committed." See Anderson v. City of Bessemer City, — U.S. —, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). For the reasons that follow, we do have such a definite and firm conviction.

The district judge's findings and conclusions give no reasons why he interpreted the advertisement as he did; these must be eked out from the transcript, and even there the pickings are few. His most significant remark came in a discussion at a conference preceding the trial on issuance of the permanent injunction. After Hertz' trial counsel stated that he wished to adduce evidence with respect to Avis cars that were not available for rental, the judge said, "It didn't say 'for rent'; [it said] 'for cars'." Avis' counsel chimed in, "It is an unqualified ad; it didn't qualify. It said, 'We have.'" Later, during the testimony of Spencer Bruno, president of a marketing and research firm that had conducted a "copy comprehension study" of the advertisement, the judge said, "[W]e have to go by the written word." Since the boldface type at the top of the advertisement proclaimed "Hertz has more new cars than Avis has cars," it was immaterial, in the judge's view, that over 6000 of the Avis cars that had to be counted to support a conclusion of falsity were in fact not available for rental.

As against this the evidence pointed unmistakably to an interpretation that Hertz was speaking of cars available for rental

No. 10 were thus correct and are the relevant ones with respect to Hertz' print advertisement campaign, which did not begin until March 1, 1984. See supra note 2.

7. According to Robert McKenna, senior vice president and general manager of Avis, these consisted of 3886 cars in retail inventory, 1184 cars in the retail pipeline, and 433 cars in wholesale inventory.

8. Car rental companies typically renew their fleets each year on a rolling basis. In the fall of 1983, Hertz determined to purchase a record number of 135,000 new automobiles in 1984 and to place orders for those automobiles sever-

al months earlier than usual. The advertisement was prepared on the basis of a study showing that Hertz would have more 1984 rental cars than Avis would have total rental cars by February 15, 1984. The study was based in part on the projected delivery dates for the 1984 cars; but these, as it turned out, were somewhat overly optimistic. Hertz introduced evidence, not countered by Avis, that as time went on during March and April the number of Hertz' 1984 cars would increase rapidly, whereas the size of Avis' rental fleet would remain relatively static.

and not of total cars owned. Hertz and Avis have made their reputations as companies that *rent* cars, not companies that sell or merely own cars. The advertisement was placed in publications that would come to the attention of prospective renters, not car buyers or financial analysts.[9] The boldface proclamation at the top of the advertisement was followed by a large picture of an airport rental lot. The text below the picture contained three specific references to rentals.

The meaning derived from reading the advertisement, namely, that Hertz was speaking of cars available for rental and would be so understood, is fortified by the extrinsic evidence. Bruno, whose firm had conducted a "copy comprehension study" for Hertz in September 1984 "to obtain and evaluate consumer comprehension of ideas" contained in the advertisement, analyzed the responses to questions posed in the study as showing that about 87% of those interviewed understood "that this ad concerned renting cars"; that "the majority of the consumers who are exposed to this ad perceive that the ad was, number one, about rental cars"; and that "no one in this sample took that headline to refer to the word fleet ... or total cars available by the companies. It took it to refer to new cars or cars for rent." Murray Gaylord of Scali, McCabe & Sloves, Hertz' advertising agency, testified that the advertisement was directed at car renters; this was confirmed by a witness from Avis' own advertising agency, McCaffrey & McCall, who testified that the advertisement had been placed in publications that "specifically reach ... the ideal prospects for rent-a-car companies" and agreed that in this and other respects the advertisement was addressed "to the renting public." Indeed, Avis states in its brief that consumers "did not care whether Hertz or Avis had more cars, new or otherwise, but ... did care about *renting* a new car—a clean low mileage car with no defects" (emphasis added).

Fundamental to any task of interpretation is the principle that text must yield to context. Recognizing this, the Supreme Court long ago inveighed against "the tyranny of literalness." *United States v. Witkovich*, 353 U.S. 194, 199, 77 S.Ct. 779, 782, 1 L.Ed.2d 765 (1957). In his determination to "go by the written word" and to ignore the context in which the words were used, the district judge in the present case failed to heed the familiar warning of Judge Learned Hand that "[t]here is no surer way to misread any document than to read it literally," *Guiseppi v. Walling*, 144 F.2d 608, 624 (2 Cir.1944) (concurring opinion), *aff'd sub nom. Gemsco, Inc. v. Walling*, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945), as well as his oft-cited admonition that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary," *Cabell v. Markham*, 148 F.2d 737, 739 (2 Cir.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

These and similar invocations against literalness, though delivered most often in connection with statutory and contract interpretation, are relevant to the interpretation of any writing, including advertisements. Thus, we have emphasized that in reviewing FTC actions prohibiting unfair advertising practices under the Federal Trade Commission Act a court must "consider the advertisement in its entirety and not ... engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately." *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2 Cir. 1963). In *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 276 (2 Cir.1981), we applied the principles of interpretation set forth in *Sterling Drug* to uphold a lower court finding that an advertisement conveyed a misleading and deceptive message under § 43(a) of the Lanham Act. Similar approaches have been taken in Lanham Act cases involving the claim that an advertisement was false on its face. *See, e.g., American Home Products Corp. v.*

---

**9.** This is true even of the advertisement placed in the national edition of *The Wall Street Journal.*

*Abbott Laboratories,* 522 F.Supp. 1035, 1040–45 (S.D.N.Y.1981) (literal meaning of advertisement must be determined in light of context in which challenged statements made and defendant's intent in making them); *Plough, Inc. v. Johnson & Johnson Baby Products Co.,* 532 F.Supp. 714, 717–18 (D.Del.1982) (in light of context and defendant's intent, literal meaning of word "sunscreen" was limited to products sought by consumers concerned with health hazards of sun exposure; therefore, defendant's advertisement claiming its product was "Number One Selling Sunscreen" was not facially false).

In its brief on appeal, Avis advances the argument that even if the advertising claim "Hertz has more new cars than Avis has cars" was facially true, it was deceptive because "it is pregnant with a false message: that a customer has a much better chance of getting a new car from Hertz than Avis." At argument this court suggested a hypothetical that would illustrate how Hertz' claim might be deceptive: Suppose that Hertz had 100,000 cars available for rental, of which 75,000 were new, and Avis had 70,000 cars available for rental, all of which were new. Although Hertz would have more new cars than Avis had cars, the customer, save perhaps for periods of peak demand, would have a better chance of getting a new car from Avis than from Hertz.

Avis' argument suffers from several defects. The first is that it was not advanced below. The trial proceeded on the basis that the advertisement was false on its face, not that it was literally true but deceptive. In consequence, the district judge made no findings as to the latter—nor could he have, since there was no evidence to support any such findings. In *American Home Products Corp. v. Johnson & Johnson,* 577 F.2d 160, 165–66 (2 Cir.1978), we quoted with approval Judge Lasker's analysis in *American Brands, Inc. v. R.J. Reynolds Tobacco Co.,* 413 F.Supp. 1352, 1356–57 (S.D.N.Y.1976), that "[i]f a statement is actually false, relief can be granted on the court's own findings without reference to the reaction of the buyer or con-

sumer of the product," but that when the claim is that a literally true statement has a tendency to mislead, confuse or deceive, evidence must be introduced to show what the person to whom the advertisement was addressed found to be the message. Here, Avis introduced no evidence to show that the public understood the advertisement to mean what Avis now says it meant, and Hertz' "copy comprehension study" provided nothing to fill the gap. Finally, there is no evidence that the composition of Avis' rental fleet was anything like that described in this court's hypothetical. Such evidence as there is suggests that, at least in March and April 1984, the proportion of new cars in the Hertz rental fleet was at least as great as, and more likely greater than, the proportion in the Avis rental fleet. Thus, even if the public had understood the advertisement as Avis claims it did, there would have been no basis for finding the advertisement deceptive.

The judgment is therefore reversed and the case remanded with instructions to dismiss the complaint.