07-0468-cv
Time Warner Cable, Inc. v. DIRECTV, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2006

(Argued: May 29, 2007                           Decided: August 9, 2007)

Docket No. 07-0468-cv

————————

TIME WARNER CABLE, INC.,

*Plaintiff-Appellee,*

—v.—

DIRECTV, INC.,

*Defendant-Appellant.*

————————

Before:

KEARSE, STRAUB, and POOLER,

*Circuit Judges.*

————————

Interlocutory appeal from an opinion and order of the United States District Court for the

Southern District of New York (Laura Taylor Swain, *Judge*) issued February 5, 2007,

preliminarily enjoining DIRECTV, Inc. from disseminating, in any market in which Time

Warner Cable, Inc. provides cable service, certain television commercials and Internet

advertisements found to likely violate the Lanham Act on literal falsity grounds.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

————————————————

Saul B. Shapiro, Patterson Belknap Webb & Tyler LLP (Sarah E. Zgliniec, Catherine

A. Williams, *on the brief*), New York, NY, *for Plaintiff-Appellee.*

Daniel H. Bromberg, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Redwood Shores, CA (Marc L. Greenwald, Sanford I. Weisburst, Quinn Emanuel Urquhart Oliver & Hedges, LLP, New York, NY; Michael E. Williams, Justin C. Griffin, A.J. Bedel, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA; and Margret Caruso, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Redwood Shores, CA, *on the brief*), *for Defendant-Appellant.*

_____

STRAUB, *Circuit Judge*:

Defendant-Appellant DIRECTV, Inc. ("DIRECTV") appeals from the February 5, 2007 opinion and order of the United States District Court for the Southern District of New York (Laura Taylor Swain, *Judge*) preliminarily enjoining it from disseminating, in any market in which Plaintiff-Appellee Time Warner Cable, Inc. ("TWC") provides cable service, certain television commercials and Internet advertisements found likely to violate the Lanham Act on literal falsity grounds. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 475 F. Supp. 2d 299 (S.D.N.Y. 2007).

This appeal requires us to clarify certain aspects of our false advertising doctrine. We make three clarifications in particular. First, we hold that an advertisement can be literally false even though it does not explicitly make a false assertion, if the words or images, considered in context, necessarily and unambiguously imply a false message. Second, we decide that the category of non-actionable "puffery" encompasses visual depictions that, while factually inaccurate, are so grossly exaggerated that no reasonable consumer would rely on them in navigating the marketplace. Third, we conclude that the likelihood of irreparable harm may be presumed where the plaintiff demonstrates a likelihood of success in showing that the defendant's comparative advertisement is literally false and that given the nature of the market, it

2

would be obvious to the viewing audience that the advertisement is targeted at the plaintiff, even though the plaintiff is not identified by name. Reviewing the District Court's decision under these principles, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

**FACTUAL BACKGROUND**[1]

### A. The Parties

TWC and DIRECTV are major players in the multichannel video service industry. TWC is the second-largest cable company in the United States, serving more than 13.4 million subscribers. Like all cable providers, TWC must operate through franchises let by local government entities; it is currently the franchisee in the greater part of New York City. DIRECTV is one of the country's largest satellite service providers, with more than 15.6 million customers nationwide. Because DIRECTV broadcasts directly via satellite, it is not subject to the same franchise limitations as cable companies. As a result, in the markets where TWC is the franchisee, DIRECTV and other satellite providers pose the greatest threat to its market share. The competition in these markets for new customers is extremely fierce, a fact to which the advertisements challenged in this case attest.

TWC offers both analog and digital television services to its customers. DIRECTV, on the other hand, delivers 100% of its programming digitally. Both companies, however, offer high-definition ("HD") service on a limited number of their respective channels. Transmitted at

---

[1]This factual background is derived from the District Court's findings of fact, which are not in dispute. *See Time Warner Cable, Inc.*, 475 F. Supp. 2d at 302-04.

a higher resolution than analog or traditional digital programming, HD provides the home viewer with theater-like picture quality on a wider screen. The picture quality of HD is governed by standards recommended by the Advanced Television Systems Committee ("ATSC"), an international non-profit organization that develops voluntary standards for digital television. To qualify as HD under ATSC standards, the screen resolution of a television picture must be at least 720p or 1080i.[2] TWC and DIRECTV do not set or alter the screen resolution for HD programming provided by the networks; instead, they make available sufficient bandwidth to permit the HD level of resolution to pass on to their customers. To view programming in HD format, customers of either provider must have an HD television set.

There is no dispute, at least on the present record, that the HD programming provided by TWC and DIRECTV is equivalent in picture quality. In terms of non-HD programming, digital service generally yields better picture quality than analog service, because a digital signal is more resistant to interference. *See Consumer Elecs. Ass'n v. F.C.C.,* 347 F.3d 291, 293-94 (D.C. Cir. 2003). That said, TWC's analog cable service satisfies the technical specifications, *e.g.* signal level requirements and signal leakage limits, set by the Federal Communications Commission ("FCC"). *See* 47 C.F.R. § 76.1, *et seq*. According to a FCC fact sheet, analog service that meets these specifications produces a picture that is "high enough in quality to provide enjoyable viewing with barely perceptible impairments."

**B. DIRECTV's "SOURCE MATTERS" Campaign**

---

[2]The "p" and "i" designations stand for "progressive" and "interlaced." In the progressive format, the full picture updates every sixtieth of a second, while in the interlaced format, half of the picture updates every sixtieth of a second. The higher the "p" or "i" number, the greater the resolution and the better the picture will appear to the viewer.

4

In the fall of 2006, DIRECTV launched a multimedia advertising campaign based on the theme of "SOURCE MATTERS." The concept of the campaign was to educate consumers that to obtain HD-standard picture quality, it is not enough to buy an HD television set; consumers must also receive HD programming from the "source," *i.e.*, the television service provider.

### 1. Jessica Simpson Commercial

As part of its new campaign, DIRECTV began running a television commercial in October 2006 featuring celebrity Jessica Simpson. In the commercial, Simpson, portraying her character of Daisy Duke from the movie *The Dukes of Hazzard*, tells some of her customers at the local diner:

Simpson: Y'all ready to order?

Hey, 253 straight days at the gym to get this body and you're not gonna watch me on DIRECTV HD?

You're just not gonna get the best picture out of some fancy big screen TV without DIRECTV.

It's broadcast in 1080i. I totally don't know what that means, but I want it.

The original version of the commercial concluded with a narrator saying, "For picture quality that beats cable, you've got to get DIRECTV."

In response to objections by TWC, and pursuant to agreements entered into by the parties, DIRECTV pulled the original version of the commercial and replaced it with a revised one ("Revised Simpson Commercial"), which began airing in early December 2006. The Revised Simpson Commercial is identical to the original, except that it ends with a different tag line: "For an HD picture that can't be beat, get DIRECTV."

### 2. William Shatner Commercial

DIRECTV debuted another commercial in October 2006, featuring actor William Shatner as Captain James T. Kirk, his character from the popular *Star Trek* television show and film series. The following conversation takes place on the Starship Enterprise:

Mr. Chekov:    Should we raise our shields, Captain?

Captain Kirk:  At ease, Mr. Chekov.

Again with the shields. I wish he'd just relax and enjoy the amazing picture clarity of the DIRECTV HD we just hooked up.

With what Starfleet just ponied up for this big screen TV, settling for cable would be illogical.

Mr. Spock:    [Clearing throat.]

Captain Kirk:  What, I can't use that line?

The original version ended with the announcer saying, "For picture quality that beats cable, you've got to get DIRECTV."

DIRECTV agreed to stop running the Shatner commercial in November 2006. In January 2007, DIRECTV released a revised version of the commercial ("Revised Shatner Commercial") with the revamped tag line, "For an HD picture that can't be beat, get DIRECTV."

### 3. Internet Advertisements

DIRECTV also waged its campaign in cyberspace, placing banner advertisements on various websites to promote the message that when it comes to picture quality, "source matters." The banner ads have the same basic structure. They open by showing an image that is so highly pixelated that it is impossible to discern what is being depicted. On top of this indistinct image is

6

superimposed the slogan, "SOURCE MATTERS." After about a second, a vertical line splits the screen into two parts, one labeled "OTHER TV" and the other "DIRECTV." On the OTHER TV side of the line, the picture is extremely pixelated and distorted, like the opening image. By contrast, the picture on the DIRECTV side is exceptionally sharp and clear. The DIRECTV screen reveals that what we have been looking at all along is an image of New York Giants quarterback Eli Manning; in another ad, it is a picture of two women snorkeling in tropical waters. The advertisements then invite browsers to "FIND OUT WHY DIRECTV'S picture beats cable" and to "LEARN MORE" about a special offer. In the original design, users who clicked on the "LEARN MORE" icon were automatically directed to the HDTV section of DIRECTV's website.

In addition to the banner advertisements, DIRECTV created a demonstrative advertisement that it featured on its own website. Like the banner ads, the website demonstrative uses the split-screen technique to compare the picture quality of "DIRECTV" to that of "OTHER TV," which the ad later identifies as representing "basic cable," *i.e.*, analog cable. The DIRECTV side of the screen depicts, in high resolution, an image of football player Kevin Dyson making a touchdown at the Super Bowl. The portion of the image on the OTHER TV side is noticeably pixelated and blurry. This visual display is accompanied by the following text: "If you're hooking up your high-definition TV to basic cable, you're not getting the best picture on every channel. For unparalleled clarity, you need DIRECTV HD. You'll enjoy 100% digital picture and sound on every channel and also get the most sports in HD – including all your favorite football games in high definition with NFL SUNDAY TICKET."

7

**PROCEDURAL HISTORY**

**A.     Filing of Action and Stipulation**

On December 7, 2006, TWC filed this action charging DIRECTV with, *inter alia*, false advertising in violation of § 43(a) of the Lanham Act. 15 U.S.C. § 1114, *et seq*. Initial negotiations led to the execution of a stipulation, in which DIRECTV agreed that pending final resolution of the action, it would stop running the original versions of the Simpson and Shatner commercials and also disable the link on the banner advertisements that routed customers to the HDTV page of its website. DIRECTV further stipulated that it would not claim in any advertisement, either directly or by implication, that "the picture quality presently offered by DIRECTV's HDTV service is superior to the picture offered presently by Time Warner Cable's HDTV service, or the present HDTV services of cable television providers in general." Finally, DIRECTV agreed that any breach of the stipulation would result in irreparable harm to TWC. The stipulation contained the caveat, however, that nothing in it "shall be construed to be a finding on the merits of this action." The District Court entered an order on the stipulation on December 12, 2006.

**B.     Preliminary Injunction Motion**

The following week, on December 18, TWC filed a motion for a preliminary injunction against the Revised Simpson Commercial, as well as the banner advertisements and website demonstrative (collectively, "Internet Advertisements"), none of which were specifically covered by the stipulation. TWC claimed that each of these advertisements was literally false, obviating the need for extrinsic evidence of consumer confusion. TWC further argued that as DIRECTV's direct competitor, it was entitled to a presumption of irreparable injury. On January 4, 2007,

after discovering that DIRECTV had started running the Revised Shatner Commercial, TWC filed supplemental papers requesting that this commercial also be preliminarily enjoined on literal falsity grounds.

DIRECTV vigorously opposed the motion. It asserted that the Revised Simpson and Shatner Commercials were not literally false because no single statement in the commercials explicitly claimed that DIRECTV HD is superior to cable HD in terms of picture quality. DIRECTV did not deny that the Internet Advertisements' depictions of cable were facially false. Rather, it argued that the Internet Advertisements did not violate the Lanham Act because the images constituted non-actionable puffery. Finally, DIRECTV argued that irreparable harm could not be presumed because none of the contested advertisements identified TWC by name.

**C.      The District Court's February 5, 2007 Opinion and Order**

On February 5, 2007, the District Court issued a decision granting TWC's motion. The District Court determined that TWC had met its burden of showing that each of the challenged advertisements was likely to be proven literally false. Addressing the television commercials, the District Court held that the meaning of particular statements had to be determined in light of the overall context, and not in a vacuum as urged by DIRECTV. Given the commercials' obvious focus on HD picture quality, the District Court found that the Simpson's assertion that a viewer cannot "get the best picture out of some big fancy big screen TV without DIRECTV" and Shatner's quip that "settling for cable would be illogical" could only be understood as making the literally false claim that DIRECTV HD is superior to cable HD in picture quality. *See Time Warner Cable, Inc.*, 475 F. Supp. 2d at 305-06. As for the Internet Advertisements, the District Court found that the facially false depictions of cable's picture quality could not be discounted as

9

mere puffery because it was possible that consumers unfamiliar with HD technology would actually rely on the images in deciding whether to hook up their HD television sets to DIRECTV or analog cable. *See id.* at 306-08.

In assessing irreparable harm *vel non*, the District Court observed that under Second Circuit case law, irreparable harm could be presumed where the movant "demonstrates a likelihood of success in showing literally false defendant's comparative advertisement which mentions plaintiff's product by name." *Id.* at 308 (quoting *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992) (internal quotation marks omitted)). The District Court acknowledged that the Revised Shatner Commercial and the Internet Advertisements did not specifically name TWC, but concluded that a presumption of irreparable harm was nevertheless appropriate because the advertisements made explicit references to "cable," and in the markets where TWC is the franchisee, "cable" is functionally synonymous with "Time Warner Cable." *See id.* As for the Revised Simpson Commercial, the District Court reasoned that although the advertisement did not explicitly reference "cable," irreparable harm should be presumed because "TWC is DIRECTV's main competitor in markets served by TWC." *Id.* The District Court further noted that DIRECTV had breached the stipulation by continuing to run the contested commercials and that this breach also supported a finding of irreparable harm. *See id.* at n.5.

In accordance with its opinion, the District Court entered a preliminary injunction barring DIRECTV from disseminating, "in any market in which [TWC] provides cable service,"

> (1)  the Revised Simpson Commercial and Revised Shatner Commercial, "and any other advertisement disparaging the visual or audio quality of TWC or cable high-definition ("HDTV") programming as compared to that of DIRECTV or satellite HDTV programming"; and

10

(2)     the Internet Advertisements "and any other advertisement making representations that the service provided by Time Warner Cable, or cable service in general, is unwatchable due to blurriness, distortion, pixellation or the like, or inaudible due to static or other interference."

## DISCUSSION

A party seeking preliminary injunctive relief must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, *and* (2) a likelihood of irreparable harm if the requested relief is denied. *See Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314-15 (2d Cir. 1982), *abrogated on other grounds by* Fed. R. Civ. P. 52(a). We review the entry of a preliminary injunction for excess of discretion, which may be found where the District Court, in issuing the injunction, relied upon clearly erroneous findings of fact or errors of law. *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 237 (2d Cir. 2001). "[T]he district judge's determination of the meaning of the advertisement [is] a finding of fact that shall not be set aside unless clearly erroneous." *Id.* (alterations in original; internal quotation marks omitted); *see also Johnson & Johnson v. GAC Int'l, Inc.*, 862 F.2d 975, 979 (2d Cir. 1988) ("*GAC Int'l, Inc.*").

### A.    Likelihood of Success on the Merits

#### 1.    Television Commercials

Section 43(a) of the Lanham Act provides, in pertinent part that:

Any person who, on or in connection with any goods or services . . . uses in commerce . . . any . . . false or misleading description of fact, or false or misleading representation of fact, which –
. . . .

11

(B)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

Two different theories of recovery are available to a plaintiff who brings a false advertising action under § 43(a) of the Lanham Act.  First, the plaintiff can demonstrate that the challenged advertisement is literally false, *i.e.*, false on its face.  *See GAC Int'l, Inc.*, 862 F.2d at 977.  When an advertisement is shown to be literally or facially false, consumer deception is presumed and "the court may grant relief without reference to the advertisement's [actual] impact on the buying public." *Coca-Cola Co.*, 690 F.2d at 317.  "This is because plaintiffs alleging a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999).

Alternatively, a plaintiff can show that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers.  *See Coca-Cola Co.*, 690 F.2d at 317. "[P]laintiffs alleging an implied falsehood are claiming that a statement, whatever its literal truth, has left an impression on the listener [or viewer] that conflicts with reality" – a claim that "invites a comparison of the impression, rather than the statement, with the truth." *Schering Corp.*, 189 F.3d at 229.  Therefore, whereas "plaintiffs seeking to establish a literal falsehood must generally show the substance of what is conveyed, . . . a district court *must* rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false

12

message." *Id.* (internal quotation marks omitted).[3]

Here, TWC chose to pursue only the first path of literal falsity, and the District Court granted the preliminary injunction against the television commercials on that basis. In this appeal, DIRECTV does not dispute that it would be a misrepresentation to claim that the picture quality of DIRECTV HD is superior to that of cable HD. Rather, it argues that neither commercial explicitly makes such a claim and therefore cannot be literally false.

### a. Revised Simpson Commercial

DIRECTV's argument is easily dismissed with respect to the Revised Simpson Commercial. In the critical lines, Simpson tells audiences, "You're just not gonna get the best picture out of some fancy big screen TV without DIRECTV. It's broadcast in 1080i." These statements make the explicit assertion that it is impossible to obtain "the best picture" – *i.e.*, a "1080i"-resolution picture – from any source other than DIRECTV. This claim is flatly untrue; the uncontroverted factual record establishes that viewers can, in fact, get the same "best picture" by ordering HD programming from their cable service provider. We therefore affirm the District Court's determination that the Revised Simpson Commercial's contention "that a viewer cannot 'get the best picture' without DIRECTV is . . . likely to be proven literally false." *Time Warner Cable, Inc.*, 475 F. Supp. 2d at 306.

### b. Revised Shatner Commercial

The issue of whether the Revised Shatner Commercial is likely to be proven literally false

---

[3]Under either theory, the plaintiff must also demonstrate that the false or misleading representation involved an inherent or material quality of the product. *See S.C. Johnson & Son, Inc.*, 241 F.3d at 238; *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997). TWC has met this requirement, as it is undisputed that picture quality is an inherent and material characteristic of multichannel video service.

requires more analysis. When interpreting the controversial statement, "With what Starfleet just ponied up for this big screen TV, settling for cable would be illogical," the District Court looked not only at that particular text, but also at the surrounding context. In light of Shatner's opening comment extolling the "amazing picture quality of [] DIRECTV HD" and the announcer's closing remark highlighting the unbeatable "HD picture" provided by DIRECTV, the District Court found that the line in the middle – "settling for cable would be illogical" – clearly referred to cable's HD picture quality. Since it would only be "illogical" to "settle" for cable's HD picture if it was materially inferior to DIRECTV's HD picture, the District Court concluded that TWC was likely to establish that the statement was literally false.

DIRECTV argues that the District Court's ruling was clearly erroneous because the actual statement at issue, "settling for cable would be illogical," does not explicitly compare the picture quality of DIRECTV *HD* with that of cable *HD*, and indeed, does not mention *HD* at all. In DIRECTV's view, the District Court based its determination of literal falsity not on the words actually used, but on what it subjectively perceived to be the general message conveyed by the commercial as a whole. DIRECTV contends that this was plainly improper under this Court's decision in *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160 (2d Cir. 1978).

TWC, on the other hand, maintains that the District Court properly took context into account in interpreting the commercial, as directed by this Court in *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381 (2d Cir. 1986). TWC argues that under *Avis Rent A Car*, an advertisement can be literally false even though no "combination of words between two punctuation signals" is untrue, if the clear meaning of the statement, considered in context, is false. Given the commercial's repeated references to "HD picture," TWC contends that the

14

District Court correctly found that "settling for cable would be illogical" literally made the false claim that cable's HD picture quality is inferior to DIRECTV's.

To appreciate the parties' dispute, it is necessary to understand the two key cases, *American Home Products* and *Avis Rent A Car*. The *American Home Products* case involved a false advertising claim asserted by McNeil Laboratories, Inc., the manufacturer of Tylenol, against American Home Products Corporation, the manufacturer of the competing drug Anacin. One of the challenged advertisements was a television commercial, in which a spokesman told consumers:

> Your body knows the difference between these pain relievers [showing other products] and Adult Strength Anacin. For pain other than headache Anacin reduces the inflammation that often comes with pain. These do not. Specifically, inflammation of tooth extraction[,] muscle strain[,] backache[,] or if your doctor diagnoses tendonitis [,] neuritis. Anacin reduces that inflammation as Anacin relieves pain fast. These do not. Take Adult Strength Anacin.

*Am. Home Prods.*, 577 F.2d at 163 n.3 (notations of special effects omitted). Another advertisement, which appeared in national magazines, advised readers:

> Anacin can reduce inflammation that comes with most pain. Tylenol cannot.
>
> With any of these pains, your body knows the difference between the pain reliever in Adult-Strength Anacin and other pain relievers like Tylenol. Anacin can reduce the inflammation that often comes with these pains.
>
> Tylenol cannot. Even Extra-Strength Tylenol cannot. And Anacin relieves pain fast as it reduces inflammation.

*Id.* at 163 n.4. The print advertisement visually depicted the aforementioned "pains" as spots located on a human body, correlating to tooth extraction, muscle strain, muscular backache, tendonitis, neuritis, sinusitis, and sprains. *Id.*

To ascertain the meaning of these advertisements, the district court turned to consumer

15

reaction surveys. *See id.* at 163. Based on these surveys, it found that: (1) the television commercial represented that Anacin is a superior pain reliever generally, and not only with reference to the particular conditions enumerated in the commercial or to Anacin's alleged ability to reduce inflammation; (2) the print advertisement claimed that Anacin is a superior analgesic for certain kinds of pain because Anacin can reduce inflammation; and (3) both advertisements represented that Anacin reduces inflammation associated with the conditions specified in the ads. *Id.* at 163-64. The district court determined that the first two claims were factually false. *Id.* at 164. Although the district court did not definitively decide the veracity of the third claim, it reasoned that "because the three claims [were] 'integral and inseparable,' the advertisements as a whole" violated the Lanham Act. *Id.* (internal quotations and citation omitted).

American Home Products appealed, arguing that since the advertisements did not contain an *express* claim for greater analgesia, they could not violate § 43(a), even if consumers mistakenly perceived a different and incorrect meaning. *See id.* This Court disagreed. It first observed that "[§] 43(a) of the Lanham Act encompasses more than literal falsehoods"; implied falsehoods are also prohibited. *Id.* at 165. The Court emphasized, however, that when an advertisement relies on "clever use of innuendo, indirect intimations, and ambiguous suggestions," instead of literally false statements, the truth or falsity of the ad "usually should be tested by the reactions of the public." *Id.* It provided district courts with the following guidance for analyzing a claim of implied falsity:

> A court may, of course, construe and parse the language of the advertisement. It may have personal reactions as to the defensibility or indefensibility of the deliberately manipulated words. It may conclude that the language is far from candid and would never pass muster under tests otherwise applied – for example, the Securities Acts' injunction that "thou shalt disclose"; but the court's reaction

is at best not determinative and at worst irrelevant. *The question in such cases is – what does the person to whom the advertisement is addressed find to be the message?*

*Id.* at 165-66 (quoting *Am. Brands, Inc. v. R. J. Reynolds Tobacco Co.*, 413 F. Supp. 1352, 1357 (S.D.N.Y. 1976)).

Applying these principles to the facts of the case, the *American Home Products* Court determined that "the district court's use of consumer response data was proper" because "the claims of both the television commercial and the print advertisement [were] ambiguous." *Id.* at 166. "This obscurity," the Court explained, "[wa]s produced by several references to 'pain' and body sensation accompanying the assertions that Anacin reduces inflammation." *Id.* Therefore, "[a] reader of or listener to these advertisements could reasonably infer that Anacin is superior to Tylenol in reducing pain generally (Claim One) and in reducing certain kinds of pain (Claim Two)." *Id.* "Given this rather obvious ambiguity," the Court concluded that the district judge "was warranted in examining, and may have been compelled to examine, consumer data to determine first the messages conveyed in order to determine ultimately the truth or falsity of the messages." *Id.* (footnote omitted).

*American Home Products* dealt with a claim of implied falsity. *See id.* at 165 ("We are dealing not with statements which are literally or grammatically untrue . . . . Rather, we are asked to determine whether a statement acknowledged to be *literally true and grammatically correct nevertheless has a tendency to mislead, confuse or deceive*." (quoting *Am. Brands, Inc.*, 413 F. Supp. at 1357)). In *Avis Rent A Car*, the false advertising action was premised on a theory of literal, not implied, falsity. In the facts of that case, Avis Rent A Car System, Inc., the self-proclaimed "Number 2" in the car rental business, sued "Number 1" Hertz Corporation over an

17

advertisement that proclaimed, in large bold print, that "**Hertz has more new cars than Avis has cars.**" *Avis Rent A Car*, 782 F.2d at 381-82. Below a picture of mechanics unloading new cars into an airport parking lot, the advertisement went on to explain: "If you'd like to drive some of the newest cars on the road, rent from Hertz. Because we have more new 1984 cars than Avis or anyone else has cars – new or old. . . . Whether you're renting for business or pleasure, chances are you'll find a domestic or imported car you'll want to drive." *Id.* at 382. At the bottom of the ad was Hertz's slogan, "**The #1 way to rent a car.**" *Id.*

At the time the advertisement was published, Hertz only had about 97,000 1984 model cars, whereas Avis had a total of approximately 102,000 cars. *See id.* at 383. However, 6776 cars in Avis's fleet were in the process of being sold and were no longer available for rental. *Id.* at 384. Thus, the literal truth or falsity of the claim that "Hertz has more new cars than Avis has cars" turned on whether the statement "referred to the rental fleets or the total fleets of the two companies." *Id.* at 383. The district court found that because the advertisement said "cars," and not "cars for rent," it had to be read as referring to the companies' total fleets and, as such, was literally false. *See id.* at 384.

This Court held that the district court's finding was clearly erroneous. It pointed out that the parties had "made their reputations as companies that *rent* cars, not companies that sell or merely own cars," and that the advertisement had appeared "in publications that would come to the attention of prospective renters, not car buyers or financial analysts." *Id.* at 385. Moreover, the advertisement featured a large picture of an airport rental lot and made three specific references to rentals. *See id.* Taking this context into consideration, the Court concluded that the claim that "Hertz has more new cars than Avis has new cars" could only be understood as

18

referring to the companies' rental fleets. The Court elaborated:

> Fundamental to any task of interpretation is the principle that text must yield to context. Recognizing this, the Supreme Court long ago inveighed against "the tyranny of literalness." In his determination to "go by the written word" and to ignore the context in which the words were used, the district judge in the present case failed to heed the familiar warning of Judge Learned Hand that "[t]here is no surer way to misread any document than to read it literally," as well as his oft-cited admonition that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary."
> These and similar invocations against literalness, though delivered most often in connection with statutory and contract interpretation, are relevant to the interpretation of any writing, including advertisements. Thus, we have emphasized that in reviewing FTC actions prohibiting unfair advertising practices under the Federal Trade Commission Act a court must "consider the advertisement in its entirety and not . . . engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately." . . . Similar approaches have been taken in Lanham Act cases involving the claim that an advertisement was false on its face.

*Id.* at 385 (citations omitted).

At first glance, *American Home Products* and *Avis Rent A Car* may appear to conflict.

*American Home Products* counsels that when an advertisement is not false on its face, but

instead relies on indirect intimations, district courts should look to consumer reaction to

determine meaning, and not rest on their subjective impressions of the advertisement as a whole.

*Avis Rent A Car*, on the other hand, instructs district courts to consider the overall context of an

advertisement to discern its true meaning, and holds that the message conveyed by an

advertisement may be viewed as not false in the context of the business at issue, even the written

words are not literally accurate.

On closer reading, however, the two cases can be reconciled. In *American Home

Products*, we did not say that context is irrelevant or that courts are myopically bound to the

explicit words of an advertisement. Rather, we held that where it is "clear that . . . the language

19

of the advertisement[] is not unambiguous," the district court should look to consumer response data to resolve the ambiguity. *Am. Home Prods.*, 577 F.2d at 164. In *Avis Rent A Car*, we concluded that there was no ambiguity to resolve because even though the statement, "Hertz has more new cars than Avis has cars," did not expressly qualify the comparison, given the surrounding context, it "unmistakably" referred to the companies' rental fleets. *Avis Rent A Car*, 782 F.2d at 384.

These two cases, read together, compel us to now formally adopt what is known in other circuits as the "false by necessary implication" doctrine. *See, e.g.*, *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 274 (4th Cir. 2002); *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 34-35 (1st Cir. 2000); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946-47 (3d Cir. 1993) ("*Pennzoil Co.*").[4] Under this doctrine, a district court evaluating whether an advertisement is literally false "must analyze the message conveyed in full context," *Pennzoil Co.*, 987 F.2d at 946, *i.e.*, it "must consider the advertisement in its entirety and not . . . engage in disputatious dissection," *Avis Rent A Car*, 782 F.2d at 385 (internal quotation marks omitted). If the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.*, 290 F.3d 578, 586-87 (3d Cir. 2002) ("A 'literally false' message may be either explicit or 'conveyed by necessary implication

[4]Several district courts in this Circuit have already embraced the doctrine. *See, e.g.*, *Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 391 (S.D.N.Y. 2003), *aff'd*, 90 Fed. Appx. 8 (2d Cir. 2003); *Tambrands, Inc. v. Warner-Lambert Co.*, 673 F. Supp. 1190, 1193-94 (S.D.N.Y. 1987).

20

when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'" (quoting *Clorox Co. Puerto Rico*, 228 F.3d at 35)). However, "only an *unambiguous* message can be literally false." *Id.* at 587. Therefore, if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false. *See Scotts Co.*, 315 F.3d at 275 (stating that a literal falsity argument fails if the statement or image "can reasonably be understood as conveying different messages"); *Clorox Co. Puerto Rico*, 228 F.3d at 35 ("[A] factfinder might conclude that the message conveyed by a particular advertisement remains so balanced between several plausible meanings that the claim made by the advertisement is too uncertain to serve as the basis of a literal falsity claim . . . ."). There may still be a "basis for a claim that the advertisement is misleading," *Clorox Co. Puerto Rico*, 228 F.3d at 35, but to resolve such a claim, the district court must look to consumer data to determine what "the person to whom the advertisement is addressed find[s] to be the message," *Am. Home Prods.*, 577 F.2d at 166 (citation omitted). In short, where the advertisement does not unambiguously make a claim, "the court's reaction is at best not determinative and at worst irrelevant." *Id.*

Here, the District Court found that Shatner's assertion that "settling for cable would be illogical," considered in light of the advertisement as a whole, unambiguously made the false claim that cable's HD picture quality is inferior to that of DIRECTV's. We cannot say that this finding was clearly erroneous, especially given that in the immediately preceding line, Shatner praises the "amazing picture clarity of DIRECTV HD." We accordingly affirm the District Court's conclusion that TWC established a likelihood of success on its claim that the Revised Shatner Commercial is literally false.

21

## 2. Internet Advertisements

We have made clear that a district court must examine not only the words, but also the "visual images . . . to assess whether [the advertisement] is literally false." *S.C. Johnson & Son, Inc.*, 241 F.3d at 238. It is uncontroverted that the images used in the Internet Advertisements to represent cable are inaccurate depictions of the picture quality provided by cable's digital or analog service. The Internet Advertisements are therefore explicitly and literally false. *See Coca-Cola Co.*, 690 F.2d at 318 (reversing the district court's finding of no literal falsity in an orange juice commercial where "[t]he visual component of the ad makes an explicit representation that Premium Pack is produced by squeezing oranges and pouring the freshly-squeezed juice directly into the carton. This is not a true representation of how the product is prepared. Premium Pack juice is heated and sometimes frozen prior to packaging.").

DIRECTV does not contest this point. Rather, it asserts that the images are so grossly distorted and exaggerated that no reasonable buyer would take them to be accurate depictions "of how a consumer's television picture would look when connected to cable." Consequently, DIRECTV argues, the images are obviously just puffery, which cannot form the basis of a Lanham Act violation. Notably, TWC agrees that no Lanham Act action would lie against an advertisement that was so exaggerated that no reasonable consumer would rely on it in making his or her purchasing decisions. TWC contends, however, that DIRECTV's own evidence – which indicates that consumers are highly confused about HD technology – shows that the Internet Advertisements pose a real danger of consumer reliance.

This Court has had little occasion to explore the concept of puffery in the false advertising context. In *Lipton v. Nature Co.*, 71 F.3d 464 (2d Cir. 1995), the one case where we

22

discussed the subject in some depth, we characterized puffery as "[s]ubjective claims about products, which cannot be proven either true or false." *Id.* at 474 (internal quotation marks omitted). We also cited to the Third Circuit's description of puffery in *Pennzoil Co.*: "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language. 'Such sales talk, or puffing, as it is commonly called, is considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer. . . . The 'puffing' rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific.'" *Penzoil Co.*, 987 F.2d at 945 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 109, at 756-57 (5th ed. 1984)). Applying this definition, we concluded that the defendant's contention that he had conducted "thorough" research was just puffery, which was not actionable under the Lanham Act. *See Lipton*, 71 F.3d at 474.

*Lipton*'s and *Pennzoil Co.*'s definition of puffery does not translate well into the world of images. Unlike words, images cannot be vague or broad. *Cf. Pennzoil Co.*, 987 F.2d at 945. To the contrary, visual depictions of a product are generally "specific and measurable," *id.* at 946, and can therefore "be proven either true or false," *Lipton*, 71 F.3d at 474 (internal quotation marks omitted), as this case demonstrates. Yet, if a visual representation is so grossly exaggerated that no reasonable buyer would take it at face value, there is no danger of consumer deception and hence, no basis for a false advertising claim. *Cf. Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) ("[T]he injuries redressed in false advertising cases are the result of public deception. Thus, where the plaintiff cannot demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement, the plaintiff cannot

23

establish that it suffered any injury as a result of the advertisement's message. Without injury there can be no claim, regardless of commercial context, prior advertising history, or audience sophistication."); *see also U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d Cir. 1990) ("Mere puffery, advertising that is not deceptive for no one would rely on its exaggerated claims, is not actionable under § 43(a)." (internal quotation marks omitted)).

Other circuits have recognized that puffery can come in at least two different forms. *See, e.g.*, *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000). The first form we identified in *Lipton* – "a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion." *Id.*; *see Lipton*, 71 F.3d at 474. The second form of puffery, which we did not address in *Lipton*, is "an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying." *Pizza Hut, Inc.*, 227 F.3d at 497; *accord United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998) ("Puffery is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable under § 43(a)." (internal quotation marks omitted)). We believe that this second conception of puffery is a better fit where, as here, the "statement" at issue is expressed not in words, but through images.

The District Court determined that the Internet Advertisements did not satisfy this alternative definition of puffery because DIRECTV's own evidence showed that "many HDTV equipment purchasers are confused as to what image quality to expect when viewing non-HD broadcasts, as their prior experience with the equipment is often limited to viewing HD broadcasts or other digital images on floor model televisions at large retail chains." *Time Warner Cable, Inc.*, 475 F. Supp. 2d at 307. Given this confusion, the District Court reasoned that

24

"consumers unfamiliar with HD equipment could be led to believe that using an HD television set with an analog cable feed might result in the sort of distorted images showcased in DIRECTV's Internet Advertisements, especially since those advertisements make reference to 'basic cable.'" *Id.*

Our review of the record persuades us that the District Court clearly erred in rejecting DIRECTV's puffery defense. The "OTHER TV" images in the Internet Advertisements are – to borrow the words of Ronald Boyer, TWC's Senior Network Engineer – "unwatchably blurry, distorted, and pixelated, and . . . nothing like the images a customer would ordinarily see using Time Warner Cable's cable service." Boyer further explained that

> the types of gross distortions shown in DIRECTV's Website Demonstrative and Banner Ads are not the type of disruptions that could naturally happen to an analog or non-HD digital cable picture. These advertisements depict the picture quality of cable television as a series of large colored square blocks, laid out in a grid like graph paper, which nearly entirely obscure the image. This is not the type of wavy or "snowy" picture that might occur from degradation of an unconverted analog cable picture, or the type of macro-blocking or "pixelization" that might occur from degradation of a digital cable picture. Rather, the patchwork of colored blocks that DIRECTV depicts in its advertisement appears to be the type of distortion that would result if someone took a low-resolution photograph and enlarged it too much or zoomed in too close. If DIRECTV intended the advertisement to depict a pixelization problem, this is a gross exaggeration of one.

As Boyer's declaration establishes, the Internet Advertisements' depictions of cable are not just inaccurate; they are not even remotely realistic. It is difficult to imagine that any consumer, whatever the level of sophistication, would actually be fooled by the Internet Advertisements into thinking that cable's picture quality is so poor that the image is "nearly entirely obscure[d]." As DIRECTV states in its brief, "even a person not acquainted with cable would realize TWC could not realistically supply an unwatchably blurry image and survive in the

25

marketplace."

In reaching the contrary conclusion, the District Court relied heavily on the declaration of Jon Gieselman, DIRECTV's Senior Vice-President of Advertising and Public Relations. However, Gieselman merely stated that the common misconception amongst first-time purchasers of HD televisions is that "they will automatically get exceptional clarity on every channel" just by plugging their new television sets into the wall. Nothing in Gieselman's declaration indicates that consumers mistakenly believe that hooking up their HD televisions to an analog cable feed will produce an unwatchably distorted picture. More importantly, the Internet Advertisements do not claim that the "OTHER TV" is an HD television set, or that the corresponding images represent what happens when an HD television is connected to basic cable. The Internet Advertisements simply purport to compare the picture quality of DIRECTV's programming to that of basic cable programming, and as discussed above, the comparison is so obviously hyperbolic that "no reasonable buyer would be justified in relying" on it in navigating the marketplace. *Pizza Hut, Inc.*, 227 F.3d at 497.

For these reasons, we conclude that the District Court exceeded its permissible discretion in preliminarily enjoining DIRECTV from disseminating the Internet Advertisements.

**B.     Irreparable Harm**

A plaintiff seeking a preliminary injunction under the Lanham Act must persuade a court not only that it is likely to succeed on the merits, but also that it is likely to suffer irreparable harm in the absence of immediate relief. *See Coca-Cola Co.*, 690 F.2d at 316. Because "[i]t is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement," we have resolved that a plaintiff

"need not . . . point to an actual loss or diversion of sales" to satisfy this requirement. *Id.* At the same time, "something more than a plaintiff's mere subjective belief that [it] is injured or likely to be damaged is required before [it] will be entitled even to injunctive relief." *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980). The rule in this Circuit, therefore, is that a plaintiff "must submit proof which provides a reasonable basis" for believing that the false advertising will likely cause it injury. *Coca-Cola Co.*, 690 F.2d at 316.

In general, "[t]he likelihood of injury and causation will not be presumed, but must be demonstrated in some manner." *Id.* We have held, however, that these elements may be presumed "where [the] plaintiff demonstrates a likelihood of success in showing literally false [the] defendant's comparative advertisement which mentions [the] plaintiff's product by name." *Castrol, Inc.*, 977 F.2d at 62. We explained the reason for the presumption in *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34 (2d Cir. 1988). There, we observed that in the case of a "misleading, non-comparative commercial[] which tout[s] the benefits of the product advertised but ma[kes] no direct reference to any competitor's product," the injury "accrues equally to all competitors; none is more likely to suffer from the offending broadcasts than any other." *Id.* at 38. Thus, "some indication of actual injury and causation" is necessary "to satisfy Lanham Act standing requirements and to ensure [the] plaintiff's injury [is] not speculative." *Id.* By contrast, where the case presents a false comparative advertising claim, "the concerns . . . regarding speculative injury do not arise." *Id.* This is because a false "comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer." *Id.* Accordingly, no proof of likely injury is necessary.

Although neither of the television commercials identifies TWC by name, the rationale for

27

a presumption of irreparable harm applies with equal force to this case. The Revised Shatner Commercial explicitly disparages the picture quality of "cable." As the District Court found, TWC *is* "cable" in the areas where it is the franchisee. *Time Warner Cable, Inc.*, 475 F. Supp. 2d at 308. Thus, even though Shatner does not identify TWC by name, consumers in the markets covered by the preliminary injunction would undoubtedly understand his derogatory statement, "settling for cable would be illogical," as referring to TWC. Because the Revised Shatner Commercial "necessarily diminishes" TWC's value "in the minds of the consumer," the District Court properly accorded TWC a presumption of irreparable harm. *McNeilab, Inc.*, 848 F.2d at 38.

The Revised Simpson Commercial, unlike the original version pulled in December 2006, does not explicitly refer to "cable." However, the fact that the commercial does not name plaintiff's product is not necessarily dispositive. As we said in *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690 (2d Cir. 1994), the application of the presumption is disfavored "where the products are not obviously in competition *or* where the defendant's advertisements make no direct reference to any competitor's products." *Id.* at 696 (emphasis added); *see also Hutchinson v. Pfeil*, 211 F.3d 515, 522 (10th Cir. 2000) ("[T]he presumption [of irreparable injury] is properly limited to circumstances in which injury would indeed likely flow from the defendant's objectionable statements, i.e., when the defendant has explicitly compared its product to the plaintiff's or the plaintiff is an obvious competitor with respect to the misrepresented product." (citing *Ortho Pharm. Corp.*, 32 F.3d at 694)). According to a survey in the record, approximately 90% of households have either cable or satellite service. Given the nearly binary structure of the television services market, it would be obvious to consumers that

28

DIRECTV's claims of superiority are aimed at diminishing the value of cable – which, as discussed above, is synonymous with TWC in the areas covered by the preliminary injunction. Therefore, although the Revised Simpson Commercial does not explicitly mention TWC or cable, it "necessarily diminishes" the value of TWC's product. *McNeilab, Inc.*, 848 F.2d at 38. The District Court thus did not err in presuming that TWC has "a reasonable basis" for believing that the advertisement will likely cause it injury. *Coca-Cola Co.*, 690 F.2d at 316.[5]

In sum, we conclude that the District Court did not exceed its allowable discretion in preliminarily enjoining the further dissemination of the Revised Simpson and Revised Shatner Commercials in any market where TWC is the franchisee. The District Court's order also forbids the dissemination of "any other advertisement disparaging the video or audio quality of TWC or cable high-definition ('HDTV') programming as compared to that of DIRECTV or satellite HDTV programming." As worded, this statement could be construed to prohibit the unfavorable comparison of even TWC's analog programming. To eliminate any ambiguity, we instruct the District Court to change the phrase "TWC or cable" to "TWC's or cable's," and the phrase "DIRECTV or satellite" to "DIRECTV's or satellite's."

## CONCLUSION

For the foregoing reasons, we AFFIRM the preliminary injunction in part, VACATE it in part, and REMAND for further proceedings consistent with this opinion.

---

[5]Because we conclude that irreparable injury was properly presumed, we need not address the District Court's alternative rationale that DIRECTV's breach of the stipulation supports a finding of irreparable injury.